THE F. W. WHEELER.

THE F. W. WHEELER v. CHURCHILL et al.

(Circuit Court of Appeals, Sixth Circuit. February 2, 1897.)

No. 424.

1. COLLISION—STEAMER AGROUND—SIGNALS.

If a steamer which, with the barge in her tow, is aground in a channel, and unable to move, shows the lights prescribed for vessels under way, and, upon the approach of another vessel, responds to signals in a way to indicate that she will keep out of the other vessel's way, and gives no warning of the danger of the actual situation, she is in fault, and responsible for damage ensuing.

2. SAME—STEAMER WITH TOW—SHEER BY TOW.

The steamer W., with a barge, A., in tow, was proceeding, at night, up a narrow channel, and met the steamer C., coming down the channel, also with a tow. The steamers were approaching nearly head on, at a combined speed of about 10 miles an hour. At about the time they met, the barge A. took a sharp sheer across the channel and across the course of the C. The W. did not stop nor throw off her tow line when the sheer began, nor until the C. had about passed her. Held, that she was in fault in not doing so, and was responsible for the ensuing collision between the A. and the C. and her tow.

3. SAME—FAULT OF TOW.

Held, further, that inasmuch as the A., if properly manned, equipped, and navigated, would have taken no such sheer into the course of the C., she would be held, in the absence of explanation, to be in fault, and also liable for the collision.

4. SAME—ERROR IN EXTREMIS.

Held, further, that it was at most an error in extremis (for which she was not responsible) for the C., instead of stopping or reversing, while coming down with a current with a tow behind her, to put on steam, in an effort to avoid collision with the A. by crossing her bows.

Appeal from the District Court of the United States for the Eastern District of Michigan.

The steam barge Porter Chamberlain and the barge Comstock, while in tow of the former, came in collision with the barge Ashland, while in tow of the steamer Wheeler. This collision occurred in Lake St. Clair, in what is known as the Grosse Pointe Channel or Cut. That channel is about 1½ miles long, and about 900 feet wide. It is marked on the upper end by a black stake and the Grosse Pointe Lightship, and at its lower end by a black stake and a spile or tripod light, as it is sometimes called. The collision occurred on November 13, 1891, at about 4:30 a. m. The night was dark, but clear. The Chamberlain was coming down the lake, and had in tow three lumber-laden barges, which were held by lines about 450 feet in length between each vessel. The Comstock was the first in the tow, and the only one of the tow which received injury. The Chamberlain was about 134 feet in length, and drew about 11 feet 6 inches, and was lumber laden. The Wheeler is a large steamer, 285 feet in length, was loaded with coal, and was drawing 14 feet and 10 or 11 inches. The Ashland was a large four-masted barge, 218 feet long, and was drawing about 15 feet. She was in tow of the Wheeler by a line about 900 feet long. The Wheeler and her consort were proceeding up the lake. At a point between the tripod light and the Grosse Pointe Lightship, the Chamberlain came into collision with the Ashland, and in a moment later the Comstock also collided with the same vessel. When about

2,000 feet from the Wheeler, and upon a course "nearly head on" with the Wheeler, the Chamberlain sounded a signal of one blast, to which the Wheeler replied with one blast. The Chamberlain was then in charge of her first mate who was on deck at the time of this exchange of signals. The wheelsman was at the wheel, and the watchman was with the mate on the forecastle deck. Her speed was between five and six miles per hour. The Wheeler was coming up the middle of the channel at a speed, as claimed by the libelants, of from three to five miles per hour. She was exhibiting two bright headlights, indicating she had a tow, and was showing to the Chamberlain both her side lights. The libelants claim that the Ashland was apparently following her steamer, and that both of her side lights were visible to the Chamberlain, and continued to show until the bows of the passing steamers were lapping, when it was noticed that the red light of the Ashland was shut out, and that her green light was sheering to the westward across the course of the Chamberlain. The steamers passed port to port about 100 feet apart, and, as they passed, a colloquy occurred between the mate of the Chamberlain, who was still on watch, and the master of the Wheeler, who was on his deck. Just what was said, and who first hailed, are matters of dispute. For the libelants it is said that the mate of the Chamberlain, referring to the green light sheering across his course, asked, "Is that your consort?" to which the officer on the Wheeler's deck replied, "Yes; look out for her." The mate then asked, "Have you still got hold of him?" and the reply was, "Yes." This mate and the other witnesses for libelants from the deck of the Chamberlain say that, as they passed the Wheeler, they could see the towline of the Wheeler, and that it was taut, and that the Wheeler was forging ahead, and pulling on the line. These witnesses also say that, when the Ashland's red light was shut out, the wheel of the Chamberlain was immediately put hard a-port. Just as this was done, the captain of the Chamberlain, aroused by the colloquy between his mate and the captain of the Wheeler, came on deck in his night dress, and took charge of her navigation. Four or five sharp blasts of the whistle were sounded as a signal to the engineer to open up his engine, with the hope of avoiding a collision under a wheel still harder a-port. The effort was in vain. According to the libelants' witnesses, the Ashland continued to approach under a sheer to the westward, at a speed of from three to five miles per hour, right across the course of the Chamberlain, and struck the port side of the Chamberlain abaft of midships, her bowsprit sweeping off the Chamberlain's after-cabin, heavy iron davits and yawl. After striking the Chamberlain, the same witnesses say, she continued her sheer, and ran into the Comstock, which was following the Chamberlain under a hard a-port wheel, striking the Comstock on her port bow, and doing some damage.

For the respondents below, who are appellants here, quite another story is told. Their witnesses, being the men and officers from the deck of the Wheeler and her consort, say that the Chamberlain, when approaching the Wheeler, did blow one blast, and that this was replied to by one blast. But they say that, when this agreement to pass port to port was made, both the Wheeler and Ashland were aground: that the Ashland was then aground some four or five hundred feet off the port quarter of the Wheeler, and was showing only her green light to the Chamberlain. This position would place the Ashland westward of both the Wheeler and the Chamberlain, and upon the westward side of the channel, the Wheeler being aground about the middle of the channel. They also say that the towline of the Wheeler was 900 feet in length, but was then slack, and on the bottom, though it had not been thrown off or cut. What occurred when the Chamberlain and the Wheeler were passing, as detailed by Capt. Ivor, of the Wheeler, was this: He says: "I sung out, 'Where are you going there?' and he says, 'Is that him showing the green light?' and I says, 'Yes,' and he says, 'Have you got his towline?' and I said, 'Yes, but I shall let go of it. Run aft, and let go the towline.' And the mate started on the run, and went aft, and let it go,—let the towline go." He then says that the Chamberlain kept "right along down on their course until they got abreast of the boiler house of the Wheeler. Then I noticed him sheer off to the westward, heard him blow his whistle, heard his exhaust working strong, as though his engine was working stronger. He bore off to the westward, and ran across the Ashland's bow, and the next thing I heard was the crash," etc. He says that, when he gave the order to let go the towline, he also stopped his engines. Touching the positions of these different crafts, this witness says that,

when the Chamberlain gave one blast, she was a little below the lightship, and the Wheeler some 600 or 700 feet above the tripod. He says the Wheeler was not going ahead, but that his engine was working, trying to work off the bottom; and that, before the whistles were sounded, the green light of the Ashland was showing, "just by the port quarter of the Wheeler." He was then asked if there was any change in the bearing of the Ashland's green light after the exchange of signals. He answered: "There was." Question: "What was it?" Answer: "Well, it opened out a little more from me, from my quarter." When asked if, when the Chamberlain was passing the Wheeler, the latter was moving, he said she was not. He also says the Ashland was not moving. The witnesses from the Ashland all concur in saying that, in their opinion, the Ashland was aground on the bank on the western side of the channel when passing signals were exchanged, and that she remained fast at the same spot until the next morning, and until pulled off by a tug. To account for this position off the port quarter of the Wheeler, the respondents' witnesses say that just when entering the lower end of the Grosse Pointe Channel, and when about abreast the tripod light, the Wheeler went aground; that she was at the time running under a check. To prevent being run into by the Ashland, an alarm whistle was sounded, and the Ashland ran up on the towline until her stem was about abreast the starboard quarter of the Wheeler. The master of the Ashland says that, while in this position, the whaleback steamer Bartlett, which was coming up the lake with a tow, passed on his starboard side, so close as to strike the Ashland a very severe blow on her starboard bow; that the immediate effect of this blow was to start the Ashland swinging westward, and that she continued to so swing until she fetched up aground off the Wheeler's port quarter some four or five hundred feet; and that she was fast aground when first the Chamberlain and then the Comstock ran into her, and remained aground on the same spot until pulled off the next morning. He further says he had been aground in the same position for some five or six minutes when the Chamberlain ran into him, and was so aground when the Wheeler and Chamberlain exchanged passing signals. Respondents' witnesses say that the Wheeler remained aground near the tripod light until after she was passed by the Bartlett and her tow, but pulled off and slowly forged ahead for about 100 feet, when she again went aground, and was fast aground, and not moving, when she exchanged signals with the Chamberlain, and when passed by the latter vessel, though her engines were working in an effort to get off, which she did not succeed in doing until the collision; that, from the time the Ashland ran up on her towline at the tripod light, she had not pulled on the towline; and that it was on the bottom when the Chamberlain passed.

The principal faults charged against the Wheeler by the libel were that she did not stop and check, as she should have done, when the Ashland took her sheer. The faults principally charged against the Ashland were, that she did not follow her steamer, but carelessly and negligently sheered off to port, and was negligent in not casting off her line to the Wheeler when she found she was sheering across the course of the Chamberlain. The district court held that, on the theory of the respondents, the Wheeler was guilty of a fault in accepting a passing signal when unable to control her own movements or those of her consort, and in not sounding an alarm to the Chamberlain to put her on guard against the known dangerous situation of both herself and her consort. But that court also held on the evidence that neither the Wheeler nor the Ashland was aground when the agreement to pass port to port was established, and that the Wheeler did not seasonably notice the sheer taken by the Ashland. The Ashland was held in fault for taking the sheer she did, and in failing to follow her steamer. The court further held that neither the Chamberlain nor her consort, the Comstock, were in fault, and assessed their damages against both the Wheeler and the Ashland. From this decree the respondents have perfected this appeal.

Frank H. Canfield, for appellants.

Wm. V. Moore, for appellees.

Before TAFT and LURTON, Circuit Judges, and SAGE, District Judge.

LURTON, Circuit Judge, after stating the facts as above, delivered the opinion of the court.

Judge Swan, who heard this case in the district court, was of opinion that the Wheeler was to be condemned, "whether she was under command, and making headway through the water, as claimed by the libelants, or whether she and her consort were practically aground, as contended by the defense." "If," said the learned and careful judge, "the Wheeler was aground when she exchanged signals with the Porter Chamberlain, it was clearly a fault on her part to accept that signal, and give her answer to assure the Chamberlain that she was under command." We are strongly disposed to agree to that conclusion upon the circumstances of this case. It is true that the district judge seems to base this conclusion upon the theory that the act of March 3, 1885 (23 Stat. 438), adopting "the revised international regulations for preventing collisions at sea," was operative on the great inland lakes and connecting waters. In this he erred inasmuch as section 2 of article 27 repeals all laws in conflict with that act "except as to the navigation of such vessels within the harbors, lakes, and inland waters of the United States." This exception operated to leave the rules of navigation found in section 4233 of the Revised Statutes in force as to the great inland lakes and rivers. The construction placed by the supreme court upon the term "high sea," in the case of U. S. v. Rodgers, 150 U. S. 249, 14 Sup. Ct. 109, has no application in the determination of the question as to whether the act of 1885 is operative upon the inland lakes, they being expressly excepted therefrom by the clause in the repealing article cited. This is the view taken by this court in the case of The North Star, 22 U. S. App. 242-250, 10 C. C. A. 262, and 62 Fed. 71. This construction of the act of 1885 is strengthened, and is made more evident by an examination of the subsequent acts of August 19, 1890, of May 28, 1894, of August 13, 1894, and of June 10, 1896. The rules of navigation found in section 4233 of the Revised Statutes furnish, therefore, the rules under which this case must be tried.

What was the duty of the Wheeler if the situation was that claimed for respondents when the Chamberlain was seen to be coming down this narrow channel, on a course so nearly parallel to that of the Wheeler, as inevitably to result in a collision, if persisted in, with the Ashland, then aground, as claimed by respondents, off her port quarter? The Wheeler, when signaled, was carrying at her masthead two bright white masthead lights, which are the lights prescribed by rule 4 for steam vessels "towing other vessels." So she was showing on her starboard side a green light, and upon her port side a red light, as prescribed by rules 4 and 5, for vessels "when under way." These rules are in terms for vessels "when under way," and their display implied that both the Wheeler and her consort were "under way," and this the approaching Chamberlain had a right to understand. When the Chamberlain signaled the Wheeler, the latter was then showing two white vertical lights at her masthead, and her two proper side lights, both indicating that she was "under way," and was "towing" a vessel behind. The single blast was a proposition to pass

port to port, and was a proper signal, for these vessels were "meeting head on" or "nearly end on." They were meeting in a narrow channel, where they must pass·on nearly parallel courses,—courses so close as that each was showing to the other both side lights. They were on courses not exceeding one-half point apart, and were therefore "meeting head on," or· "nearly end on," so as to involve risk of collision, within the meaning of rule 18 of section 4233. The Nichols, 7 Wall. 656–665.

Rule 1 of the pilot rules, adopted by the supervising inspectors, on page 53 of the general rules and regulations prescribed by the board of supervising inspectors of steam vessels, as amended January, 1891, provides as follows:

"When steamers are approaching each other 'head and head,' or nearly so, it shall be the duty of each steamer to pass to the right, or port side, of the other; the pilot of either steamer may be first in determining to pursue this course, and thereupon shall give, as a signal of his intention, one short and distinct blast of his steam whistle, which the pilot of the other steamer shall answer promptly by a similar blast of his steam whistle and thereupon such steamers shall pass to the right, or port side of each other. But if the course of such steamers is so far on the starboard of each other as not to be considered by pilots as meeting 'head and head,' or nearly so, the pilot so first deciding shall immediately give two short and distinct blasts of his steam whistle, which the pilot of the other steamer shall answer promptly by two similar blasts of his steam whistle, and they shall pass to the left, or on the starboard side of each other."

The establishment of an agreement to pass port to port, which was clearly the proper proposition under rule 18, and under the supervising inspectors' rule above set out, for the Chamberlain to propose, placed each vessel under the·equal obligation of keeping to the port of the other. The Chamberlain was under no higher obligation to go to the westward of the Wheeler far enough to pass her at a safe distance than was the Wheeler to go to the eastward far enough to pass the Chamberlain safely. The obligation of the Wheeler was also the obligation of her tow, and her agreement implied that her tow should likewise do all that was reasonable to enable the Chamberlain and her tow to pass, port to port. We think the acceptance of the signal was as if the Wheeler had said: "I am directing my course to starboard, am under way, and am in control of my own movements, and those of my tow."

Rule 24 provides that:

"In construing and obeying these rules, due regard must be had to all dangers of navigation, and to any special circumstances which may exist in·any particular case rendering a departure from them necessary in order to avoid immediate danger."

The inability of the Wheeler to control her movements, or those of her consort, which had sheered across the course of the vessel coming down, imposed on the master of the Wheeler the duty ·of warning the approaching vessel of·the danger of the situation. He had no right by lights and signals to give the Chamberlain to understand that her course was clear to pass port to port without greatly changing a course which was manifestly so "end on" or "head and head" with himself as to certainly bring him in collision with his helpless consort off his port quarter,—a collision which neither the Wheeler nor the Ashland could avoid by any

movement of their own. Special circumstances existed, known to the Wheeler, and not known to the Chamberlain, which required prompt attention, and warning should have been given to the Chamberlain that she might adopt proper precautions. The acceptance of the signal given by the Chamberlain was clearly misleading, for it gave her the right to understand that she could pass safely on the port side of the Wheeler, and that her consort was under control, and would be no hindrance if she passed as proposed. The suggestion of counsel that the Wheeler was compelled by the rules of navigation to reply to the single blast whistle of the Chamberlain by a like signal, regardless of her inability to control her own movements or those of her tow, and regardless of the fact that her tow was then lying aground across the course of the approaching steamer, has no foundation. The application of the rule requiring vessels approaching end on or nearly end on to pass port to port is one which must be modified by rule 24, requiring regard to be given to all special circumstances and dangers of navigation. It has been more than once said that:

"The question of culpable negligence is not determinable absolutely by any rule of navigation; that these rules are not inflexible, and a vessel which adheres to them in form may still be at the same time guilty of a tortious injury to another which fails to observe them." The Pilot, 19 Fed. Cas. 691; The Santa Claus, Fed. Cas. No. 12,327.

In the case first cited, Justice McLean further said:

"It is eminently proper that a strict observance of any of these regulations should be avoided when there is a plain risk in adhering to them, and it is entirely in the power of either vessel to escape a collision by departure from the methods provided by the rules." 19 Fed. Cas. 693.

It is no answer to say that the Wheeler had a right to presume that the Chamberlain meant to go beyond the western bounds of the deep water channel. That well-marked 16-foot channel was the ordinary course pursued by vessels in passing down the lakes, even though drawing less water, and therefore able to traverse the shallower waters east and west of the dredged channel. The master of the Wheeler when he accepted the Chamberlain's signal did not know the draught of the Chamberlain nor of her tow. According to the claims now made for him, he knew the channel was obstructed on his port side by his grounded consort, and yet by his reply signal he in effect said: "I am in control of the movements of my own vessel and of my consort, and am directing my course and that of my tow to the starboard, so that you may safely pass me on my port side, as you propose, provided you direct your course to starboard far enough to leave me at a safe distance on your port side." If the Chamberlain knew, or ought to have known, that the Wheeler and her tow were fast aground, much would be expected of her in avoiding vessels so situated, and much less would be required of vessels so disabled or at anchor. The burden of proof in such a case would be upon the vessel in control of her movements. The John Adams, 1 Cliff. 404-413, Fed. Cas. No. 338; The Rockaway, 19 Fed. 449.

There were no circumstances to indicate to the Chamberlain that the Wheeler was fast or not under control until too late to avoid

collision. That she was not given this notice was the fault of the Wheeler. The duty of the Chamberlain under the circumstances was to provide for a sufficient margin to safely pass the Wheeler and her tow under the dangers of navigation known, or which ought to have been known under all the circumstances. She did pass safely on the port side of the Wheeler, and would have so passed the Ashland if the latter had followed her steamer, as she was bound to do. It is not a case where she failed to make allowance for contingencies which ought to have been provided against, as in the cases cited by counsel for respondents of The City of Springfield, 29 Fed. 923, and Wells v. Armstrong, Id. 217.

From this view of the rightful meaning of the signals displayed by the Wheeler, and of the agreement to pass port to port, it is not probable that the situation of the Wheeler and her consort was other than that indicated by her lights and signals. The improbability that an experienced and expert navigator would have invited the Chamberlain to continue on a course which would enable her to pass the Wheeler at a safe distance, but which, if followed, would inevitably bring her in collision with the Ashland, is so great as to lead us to doubt the reliability of the evidence relied upon to show that neither the Wheeler nor Ashland was under headway or control when signaled by the Chamberlain. The improbability of such a gross fault in navigation as the failure to give notice by alarm whistles of the danger of the situation claimed to exist by the respondents leads us to concur in the holding of the district court that the Ashland was not aground when signals were exchanged, and that the Wheeler was also under headway, though possibly her speed was retarded by the shallowness of the water. The story told by the witnesses for the libelants is much more probable than that we are asked to credit in order to exonerate the Wheeler and her consort. That the Wheeler did go aground about the time she entered the Grosse Pointe Channel is satisfactorily shown by the evidence of the master of the Bartlett, who was following behind the Wheeler, and who observed the Ashland run up on her towline until she was nearly abreast of the Wheeler, and off her starboard quarter. The evidence of the same very intelligent and disinterested witness indicates that the blow the Ashland received on her bow quarter was a comparatively light one, and had no immediate effect in turning her head to the westward, for he says he watched her until his entire tow had passed her, and she was showing only her red light, which clearly indicated that she was still heading eastward. The probability is that this running up on her towline continued until the Ashland lost her steerage way, sheered to port, and continued this sheer when the Wheeler again forged ahead, and began to pull on the towline. The probability, on all the facts and circumstances, is that this sheer to port had about straightened out the Ashland behind the Wheeler when the Chamberlain proposed to pass port to port, and that at that time she was showing both side lights to the Chamberlain. The sheer, however, continued, and was not broken until after she had collided with both the Chamberlain and the Comstock. That the Wheeler got under way after

she went aground near the tripod light, and was proceeding on her way when the Chamberlain passed her, is, in our judgment, established. That her speed was retarded by the shallowness of the water is likely, but that she was pulling on her towline, as testified to by the officers and men on the Chamberlain, we have little doubt. The effect of the forging ahead of the Wheeler was only to make matters worse. It gave impetus to the Ashland, and caused her to progress up the lake under a strong sheer to the westward, and pulled her more and more across the course of the Chamberlain. That the Ashland was not aground when the collision occurred, and that she continued her sheer until she afterwards went aground west of the channel, is strongly confirmed by the evidence of Capt. Glass of the schooner Dauntless. The Dauntless had been lying at anchor off Grosse Pointe for about 40 days, and was a considerable distance west of the channel, and in water only about 13 feet deep. He was on his schooner the night of this collision, but did not see it. He says, however, that early in the morning he observed the Ashland was aground within 100 or 150 feet of the Dauntless, but that the wreckage from the Chamberlain was fully 1,000 feet lower down the lake; that this wreckage was anchored by the heavy iron davits attached thereto, and, in his opinion, lay substantially where it had fallen from the Chamberlain, by reason of being so anchored. The distance between the place where the Bartlett passed the Ashland and where she was found the next morning must be fully one mile. Now, if she had nearly lost her steerage way when hit by the Bartlett, as testified to by both the master of the Bartlett and the master of the Ashland, and if it be also true that she did not have out her staysail nor any other canvas, it is hard to understand how she had made such headway unless she was towed by the Wheeler. Yet this progress up the channel was without sail, and against the current, and occurred within 15 or 20 minutes after the Bartlett passed up. The circumstances strongly indicate that the Wheeler was under way, and was pulling the Ashland, as claimed by libelants.

We need not further discuss the evidence. We agree with the finding of the district court that the circumstances of the collision are substantially as claimed by the libelants. The Wheeler must be condemned for not stopping when the sheer began, or in not throwing off the towline sooner. If she stopped or threw off the towline at all, it was only when the collision was inevitable. If she had closely watched the course of her tow, this collision might have been averted. The channel was narrow. A steamer with a tow was coming down. There was neither time nor room for maneuvering or speculating. The Ashland was 900 feet behind the stern of the Wheeler, and her course not so promptly observable from the deck of the Chamberlain as from that of the Wheeler. The Wheeler does not claim to have stopped her engine or to have thrown off the towline until the steamers had about passed. It was then too late. The collision was inevitable. The Chamberlain and Ashland were approaching each other at a com-

bined speed of probably 10 miles per hour. A little over a minute would bring them together. Indeed, it is not claimed for the Wheeler that she took any steps to throw off the towline or stop the progress of the Ashland until just as the steamers passed. The defense has been put on a wholly different ground,—one which we are constrained to hold is not supported. The Ashland was also grossly at fault. The story that she was swung to the westward solely by the blow of the Bartlett is overthrown by the facts stated by the captain of the Bartlett, namely, that, after he and his entire tow had passed the Ashland, she was still heading to the eastward, and showing only her red light. The theory that her sheer to the westward was due to the blow she sustained from the Bartlett, being thus overthrown by the evidence of a wholly disinterested and capable navigator, leaves its cause wholly unexplained. If properly manned, equipped, and navigated, she would have taken no such sheer. That sheer was the proximate cause of this collision. Such a sudden and improper change of course was a very plain violation of the rules of navigation, and the burden is upon the Ashland to explain its cause. Unless it was the result of inevitable accident, she must be condemned. That is not shown. The Olympia, 22 U. S. App. 69, 9 C. C. A. 393, and 61 Fed. 120.

Touching the charge that the Chamberlain was at fault in not stopping or reversing, but, instead thereof, putting her wheel hard a-port, and working her engine with all its power, in order to cross the bows of the Ashland, we quite agree with the district judge, who on this subject said:

"Under the circumstances, this must be regarded as a venial fault, if fault it was. It must be remembered that the Chamberlain was behind her tow of three vessels, all lumber laden, and was coming down with a current of perhaps 2 miles an hour. The combined speed of the meeting tows was probably 10 miles an hour, and, although the Ashland was about 800 feet astern of the Wheeler, her course, the proximity of the vessels, after she had shut out her red light, was such that it would have been impossible for the Chamberlain to have avoided her. The combined speed of these vessels would bring them together in about one minute,—too short a time to have enabled the Chamberlain to have averted the collision. If she had stopped and reversed, she would have hazarded collision with her own tow, which, having no motive power of their own, could not be expected to clear her, and would also have incurred the risk of fouling her towline with her screw as the tow ran up on the steamer; and, in all probability, a much more disastrous collision would have involved, not only the Chamberlain and the Ashland and the Comstock, but the Breton and the Gebhardt as well. The conditions which confronted the master of the Chamberlain when called upon to act in face of the danger threatened by the approach and the course of the Ashland are amply excusatory of any error of judgment or technical violation of the statutory rule that a 'vessel approaching another so as to involve risk of collision shall slacken her speed, or stop and reverse if necessary.' The Chamberlain had scarcely cleared the Wheeler when the Ashland's sheer was observed. In the short distance which separated these vessels, the only measure which promised safety was that taken by the Chamberlain. That it failed of its intended effect does not condemn its wisdom. At most, it was an error in extremis, made in the effort to avoid the greater casualty which any other course would, in all probability, have produced."

The error assigned in respect to an allowance for loss of one voyage while undergoing repairs is overruled. The evidence supports the decree in that regard. Decree affirmed, with costs.