## THE MAURICE B. GROVER.

### (District Court, N. D. New York. March 25, 1897.)

COLLISION—SIGNALS—STEAMER AGROUND IN CHANNEL—ACTS IN EXTREMIS.

A steamer aground in the river St. Mary, about 300 feet south of the light crib at Sailors' Encampment Island, *held* solely in fault for a collision with her of a descending steamer, in that she failed to answer the usual signal given by the latter on turning the bend above, and gave no signal indicating that she was aground; and later, when the danger of collision was apparent, gave a signal of four blasts to summon a tug, which was understood on the other vessel as a signal to come on, or hurry up. The latter vessel *held* not in fault for an alleged mistake in choosing the side for passing, such choice having been made in the face of a sudden peril, brought about by the inexcusable negligence of the steamer aground.

Norris Morey, for libelant.
Harvey D. Goulder, for claimant.

COXE, District Judge. On the 7th of May, 1896, the steamers Maurice B. Grover and John V. Moran collided in the river St. Mary at a point about 300 feet south of the light crib at Sailors' Encampment Island. The Moran was proceeding from Buffalo to Duluth loaded with 600 or 700 tons of freight. She is 214 feet on the keel, 234 feet over all and 37 feet beam. On the day in question she drew about 12 feet 2 inches aft and 7 feet forward. After having delivered some freight at the Mill dock she resumed her voyage, and, in crossing the shoal below the light crib, she ran

aground about 5 o'clock in the afternoon and remained there until she was struck by the Grover some two hours afterwards. The Grover is 300 feet over all and 40 feet, 8 inches beam. She was loaded and was proceeding down stream destined for Buffalo. Her draught was about 13 feet 10 inches.

Navigation at the Sailors' Encampment channel has always been regarded as dangerous and particularly so in May, 1896, when the water was unusually shallow. At a point known as "the dark hole," some distance above, the Grover gave the usual bend whistle to warn approaching vessels that she was coming down the river. At the turn above the crib a dredge was lying near the line of the channel, which is about 300 feet in width. To make the turn, avoid the dredge and straighten up on the Encampment range line was a maneuver of considerable difficulty. The Grover accomplished it about sundown and was proceeding on the usual course when she became aware that the Moran was lying in the channel below the crib. The exact position of the Moran at this time is in dispute, but the court is of the opinion, after giving due weight to all the testimony, that she was lying across the western half of the chan- nel headed a little up stream, her bow pointing towards Ross' dock and reaching to or nearly to the range line which marks the center of the channel at this point. It is impossible to locate the Moran with perfect accuracy but if the libelant's theory of her position is accepted without qualification the court must not only convict a large number of respectable and disinterested witnesses, who say they saw the Moran's bow over the range line, of perjury, but it must find the master of the Grover guilty of incredible stupidity in attempting to go under the stern of the Moran when, substan- tially, the entire channel was open before him. On the other hand it is impossible to see how she could have extended 30 or 40 feet beyond the range line when the mark on her keel indicated that she was held by an obstruction on the shoal some 80 feet from her stern. Again, it is undisputed that on passing close to the black stake the Grover put her helm hard a-port and that she was still swinging to starboard when the collision occurred. A simple ex- periment will demonstrate that it would have been impossible for her bow to strike the Moran 108 feet from the latter's bow if she were lying where the claimant locates her. To a layman it seems impossible that the Grover, under a port helm, and still swinging to starboard after passing the black stake, could have hit the Moran amidships at a point only about 70 feet west of the center of the channel. The safer way in these cases is to give credence to all the evidence and the presumptions to be drawn therefrom and locate the vessels as accurately as possible from a general concensus of all the testimony.

At the time of the collision the Moran had up her running lights. She gave no signal to the Grover at any time. but just previous to the collision, and after the Grover had straightened up on the En- campment range, she blew -a signal of four blasts for a tug to

come to her assistance. The tug answered the signal but those in charge of the Grover swear that they did not hear the answer. The signal of four blasts may mean a call for a tug or it may mean "hurry up," depending upon the length of the blasts. At the time of the collision the sun had gone down behind the western trees, but it was still light and there is no pretense on either side that any embarrassment was occasioned by fading or insufficient light. There was no wind which at all affected navigation. The current at the Encampment is between two and three miles an hour. The chart introduced in evidence indicates that for a considerable distance east of the channel and below the point where the Moran lay the water was deep enough for the navigation of a vessel of the draught of the Grover. On the other hand there is evidence that vessels similar in size have touched bottom there. It is not pretended that the collision was due to inevitable accident. It is conceded on all sides that it was the result of careless seamanship.

The accusations against the Moran are as follows:

First. She went aground negligently. She knew of the improvements being made and of the coamings thrown up in cutting the new channel. She was warned of the shoal orally and by the flags which marked the danger limit. She took the risk deliberately and with full knowledge of the situation, when, had she gone below the flags there would have been no danger of grounding.

Second. Having gone aground at a point where she was a menace to passing vessels it was her duty to get away as quickly as possible. A tug offered her services immediately and there is every reason to believe that had they been accepted the Moran would have floated long before the Grover appeared upon the scene. Negligence is predicated of the refusal to accept the assistance of the tug.

Third. It is said that the Moran was negligent in displaying her running lights. Seeing her red light and white foremast light a descending vessel had a right to assume that the Moran was under way and crossing the river.

Fourth. The Moran should have given a danger signal. She was lying directly across the westerly half of a narrow, shallow and difficult channel, at a point where the channel takes a sharp westerly turn. She was aground and helpless. She should have informed the Grover of her plight.

Fifth. It was a palpable fault for the Moran to give the signal for the tug after the Grover had made the turn above the light crib and a collision seemed probable.

There is force in all of these propositions but the last two only will be considered.

When the Grover gave the bend signal at "the dark hole" it was clearly the duty of the Moran to answer it. This would be so in any case. The Grover hearing no response to her signal had the right, pursuant to the inspectors' rule, to consider the channel at the Encampment clear. But if this were a duty devolving upon the Moran when under way how much more was it her duty when lying

aground? Without doubt the Grover was entitled to notice of this fact. How was she to know that a vessel lying below the crib was aground? How could the Grover maneuver intelligently in ignorance of this fact? There was danger in the Moran's position. She should have given the danger signal in time. The F. W. Wheeler, 78 Fed. 824. If the Grover had known before making the turn upon the Encampment range that the Moran was aground the collision would have been avoided. Instead of doing this the Moran remained silent when she should have spoken and spoke when she should have remained silent. When it was too late to give any signal which could avail and just at the time when the situation was critical and becoming dangerous the Moran gave four blasts upon her whistle. This was intended as a call for assistance from the tug. But if the blasts were short, and they may well have been curtailed in the excitement of the moment, the signal was an invitation to the Grover to "come on," to "hurry up." It was so understood by the master of the Grover. It is not important to inquire whether the Grover was justified in mistaking the signal. The Grover was so near at the time that it was impossible for the tug to render any assistance before the Grover passed. The Moran should have waited until the danger was over before complicating still further an already hazardous situation by a premature and misleading signal. The problem confronting the Grover was difficult enough without adding a new element of uncertainty. To give an unnecessary signal at such a time which might be misconstrued into a request to do the worst thing possible was a grave fault.

The Grover is charged with fault in the following respects:

First. That she proceeded at too great a rate of speed.

Second. That she did not maintain a competent lookout.

Third. That she was not manned by a competent and sufficient crew.

Fourth. That she did not stop and reverse in time.

Fifth. That she should have turned her head to the eastward and passed around the bow of the Moran instead of attempting to run under her stern.

There is no evidence to establish the first four of these propositions. The evidence is uncontradicted that the Grover checked down three times before reaching the Encampment range and was proceeding at a slow rate of speed, barely sufficient to give her steerageway. She had a full complement of officers and men and they were at their respective posts. The moment a collision seemed probable her engine was reversed and she was backed with all the power at her command.

The sole question, then, to be considered is whether or not negligence can be imputed to the Grover in porting instead of starboarding when a short distance—about 150 feet—above the crib. Viewed in the light of all that is now known it certainly seems that it would have been wiser if the Grover had attempted to pass across the bow of the Moran. Other vessels, alone, and with tows, had

passed her bow in safety both ascending and descending the river. One of these, the Menedosa, in tow of the Glengarry, was approximately the same size and draught as the Grover, but the testimony establishes the fact that she rubbed against the shoal to the eastward of the channel in making the turn. It should also be borne in mind that the bow of the Moran had swung down during the time she lay aground and projected further into the channel at the time of the collision. But it is manifestly unfair to judge the Grover in the light of the situation as it is now developed. The judge should endeavor, as far as possible, to place himself in the position of the master of the Grover and pass judgment upon his action in the light of what was known at the time. Had the master known that the Moran was aground 300 feet from the crib, had he known of the shoal and of the danger which confronted him, it would not be difficult to inculpate the Grover. At the trial it was thought that this view might with propriety be taken, but the more the record has been studied, the more settled has become the conviction that the Grover cannot be held responsible for mere errors of judgment committed in extremis, errors fairly attributable to the negligence of the Moran. The Grover supposed that the Moran was under way. She was headed directly across the river. To attempt to run across her bow in such circumstances would have been culpable negligence. The master of the Grover did not know of the presence of the shoal at the point where the Moran lay. Few of the river pilots knew of it. The master of the Moran was certainly ignorant of it or he would not have attempted to cross at that point. A number of accomplished mariners whose experience is unquestioned testified that it would have been impossible to have passed the bow of the Moran without running upon the rocks. Others thought it was possible; but this is not material as bearing upon the proposition now under consideration. The question is not whether the Grover adopted the best possible course but whether she adopted the best course in the sudden exigency which confronted her. Did the master of the Grover do what a prudent mariner in like circumstances might have done? By reason of the inexcusable fault of the Moran he found himself face to face with a sudden peril. He had to choose in a moment whether to turn to the right or to the left. He decided to take the usual course and go to the right. This course seemed to him at the time to present fewer obstacles than the other. There was danger no matter which course he adopted. There was no time for nice calculation. The dilemma was made by the Moran; he was not responsible for it; he did what seemed to him best. Assume that he was wrong; the rule is clear that a vessel cannot be held liable for mistakes committed in such exigencies.

It is argued that the Grover was at fault for not giving the signal required by rule 24 of the act of 1895 (28 Stat. 649). The rule seems inapplicable to the case at bar for the reason that these steamers were not "meeting." In any view it is not perceived how the signal could have aided the Moran as she was aground and unable to move.

After giving the most careful consideration to the testimony the court has been compelled to reach the conclusion that the collision was due solely to the negligence of the Moran. The libel is dismissed.