**THE P. E. CROWLEY.**

**INTERLAKE S. S. CO. v. GREAT LAKES TRANSIT CORPORATION.**

**THE ARCTURUS.**

No. 1935.

District Court, W. D. New York.
Oct. 17, 1936.

McKeehan Merrick, Arter & Stewart and George William Cottrell, all of Cleveland, Ohio (George William Cottrell and Carl A. Schipfer, both of Cleveland, Ohio, of counsel), for libelant and cross-respondent.

Brown, Ely & Richards, of Buffalo, N. Y. (John B. Richards, Laurence E. Coffey, and W. A. Eldridge, all of Buffalo, N. Y., of counsel), for respondent, claimant and cross-libelant.

RIPPEY, District Judge.

These actions arose out of a collision between the steamer P. E. Crowley, owned by the Great Lakes Transit Corporation, a corporation organized under the laws of the state of New York, and the steamer Arcturus, owned by the Interlake Steamship Company, a corporation organized under the laws of the state of Delaware, at about 5:15 a. m., June 9, 1934, within and near the south line of the channel leading from Lake Erie into the harbor at Erie, Pa.

The channel through which vessels must pass to reach Erie Harbor extends in a southwesterly direction from the lake entrance. It is over 9,000 feet long, dredged to a width of 300 feet and to a depth of 20 feet, with sloping sides over which is shallow water. The water is from 15 to 17 feet deep above the banks of the channel along the outer 3,000 feet of its length and

from 3 to 5 feet deep above the banks along the inner 3,000 foot stretch. At the entrance are two buoys, one on each side of the channel, red on the northerly side and black on the southerly side. The United States government maintained two piers along the channel edges. The pier on the north bank was 3,400 feet long, its easterly end being about 3,000 feet from the entrance. At the east end of the pier was a fog horn; 500 feet further to the west was the Presque Isle Light; 1,500 feet further west was the coast guard station; and 500 ·feet westward was the lookout tower. At the west end was a range dummy known as Erie Range Light No. 1; to the west were Red Buoys No. 4, No. 6, and No. 8. It was approximately 4,300 feet from the coast guard station to Red Buoy No. 8, 3,800 feet from the lookout tower to the same buoy, and 3,000 feet from the west end of the pier to that buoy. The westerly end of the north bank of the dredged channel was about 800 feet west of the Red Buoy No. 8, but the harbor continued to the westward at an approximate depth of 20 feet for about two miles. The pier on the south side of the channel extended westerly about 2,200 feet from a point about 3,800 feet from the entrance. Approximately 2,550 feet to the west of the west end of this pier was Black Can Buoy No. 5, known as the turning buoy, marking the easterly point where vessels might enter the basin proper. The basin was also dredged to a depth of 20 feet. The dredged basin, or inner harbor, extended southerly from the channel 2,500 feet and westerly about 4,500 feet, but the balance of the harbor was from 16 to 22 feet deep and extended westerly over two miles. Along the southerly border of the basin were various docks, among which was the "coal dock" located nearest to the Lake, toward which the Arcturus was bound.

Vessels were prohibited from docking along either of the government piers and could not anchor along other parts of the channel without danger of grounding in the shallow waters along the sides. Obviously, a vessel passing through the channel was required to keep in motion at a sufficient speed for control, especially under conditions of wind and current at and preceding the time of the collision. The movements of the vessels immediately preceding and at the time of the collision occurred in daylight; visibility was good for at least four miles; and a stiff wind was blowing offshore from the south at a rate of 20 to 25 miles per hour, necessarily causing a flow of water through the channel outwardly toward the Lake and, at the same time, tending to blow a lightly loaded boat against the north banks. Navigation was difficult.

The steamer Arcturus was a steel bulk freighter, 514 feet long, 31 feet deep, and with a beam of 54 feet. She had come up the Lake from Fairport at a speed of 10 miles per hour, without cargo but with water ballast, bound for the "coal dock" in Erie Harbor to take on a load of coal. Her draft was 6' 1"–2" forward and 14' aft. Her captain was called at about 4:30 a. m. and took charge of the vessel about two miles off the entrance. He took his place in the upper pilot house on the forward end of the ship. With him were the third mate and the wheelsman, and the lookout was on the forecastle head. The captain had taken the vessel into Erie Harbor only once before and had never previously dropped her anchor in that harbor. He then saw the Crowley 6 or 7 miles away coming from the eastward and headed for Erie Harbor. He knew she was a line boat and was going to follow him in through the channel. He checked his vessel to about 6 miles per hour and passed between the outer buoys at about 4:47 a. m., and again checked the speed to some 3 miles per hour as he passed between the piers, holding her course close to the left hand pier on account of the wind blowing against her side from that direction. He proceeded with the vessel close to the left bank of the channel until his bow reached the turning buoy (Black Can No. 5), whereupon he put her wheel hard astarboard, cutting in close (within 25 to 30 feet of the buoy), intending to swing sharply at right angles to the channel and to follow the east line of the basin straight south to the coal dock. The vessel refused to turn into the wind as intended, whereupon, while the vessel was still moving forward in the channel, the master dropped her port anchor so that it might drag and help the rudder turn the ship. The anchor weighed four tons and the chain was 90 fathoms long. The amount of chain let out on the first order was insufficient; the vessel simply dragged it forward in the channel. The master ordered more chain out, which was done, whereupon the anchor gripped in and became foul, and the vessel started to swing. Thirty fathoms of chain was run out when the windlass was locked. He attempted to free the anchor without success. The ves-

sel continued to swing until she was head-reaching into the wind with Gas Buoy No. 8 almost directly over her stern and with some 150 feet of her rear end still in and across the channel. The engines were kept running forward at half speed, but the anchor held the vessel in that position until the collision. It is difficult to make sense out of the captain's testimony concerning happenings from the time he started to turn out of the channel until his vessel stopped her forward movement. He testified that he dropped the anchor while he was still in the channel and that it took hold before he left the channel. He said there was only 50 feet of his boat left in the channel. If he ran out only 30 fathoms of chain (he testified before the inspectors that he ran out only 15 fathoms), when the vessel finally swung around it can readily be seen that at least 300 feet of the vessel would still be in the channel, thus completely blocking it. That was not the fact. It must be that the anchor was dragged some distance into the basin. In view of the unreliable testimony of the captain, it must be found, as the mate testified and as other testimony and computations show, that the vessel blocked at least one-half of the channel from the time she ceased going forward until the collision occurred. The captain asserts that, when his anchor fouled, he saw the Crowley about to enter between the piers, that he then hoisted his black ball (the day signal that a ship is at anchor) and blew several blasts and followed with a three-blast signal when the Crowley was about at the west end of the north pier, to which no reply was made, and that he again blew a three-blast signal when the Crowley was about at the coast guard station, to which he received no reply. Notwithstanding, the Crowley did not answer the five-blast danger signal, which she was required by the rules to do if she heard it. The captain of the Arcturus claims she continued to come on at full speed and that no other danger signal was blown. After the Crowley had passed by the piers, her captain blew a one blast of the whistle signifying his intention to go under the stern of the Arcturus, to which the latter made no reply, expecting that she could easily go under the stern without danger to either vessel.

The P. H. Crowley was a steel packet freighter 381 feet long, 29 feet deep, and with a beam of 51 feet. At the time of the collision she was about one-third loaded and was drawing 11 feet forward and 15 feet aft. She was staunch, sound and seaworthy, and was fully and adequately manned, officered, and equipped. She passed between the outer buoys at 5 a. m., traveling at the rate of about 12½ miles per hour, and immediately thereafter her captain saw the Arcturus' stern beyond Black Can No. 5, and she seemed to him to be headed in toward the dock. As the Crowley approached the entrance to the piers, the captain, the first mate, and the lookout saw jets of steam issue from the whistle of the Arcturus, and the lookout heard three, four, or five blasts. After a consultation these three decided that the Arcturus was blowing a dock signal, and continued at full speed. The Crowley's speed in the shallow water from the outer buoys to the piers was about 10½ miles per hour and about 8½ miles per hour between the piers. She continued to a point about opposite the lookout tower, when she heard the Arcturus blow a three-blast signal. At about the same time, as the wheelsman testified, the Crowley took a sudden sheer—her stern went to starboard, her bow to port. As it was only a slight sheer, the wheelsman was able to straighten the vessel up with a port wheel, so that he did not call the captain's attention to it. After the Crowley had traveled another 800 or 1,000 feet, her engines were reduced to half speed, which propelled the ship at the rate of about 6 miles an hour. When she was about 1,600 feet from the Arcturus, she blew a one-blast signal indicating her intention to go under the Arcturus' stern. She was steering a course a little to the north of the center of the channel with a little starboard wheel holding her bow up into the wind. She would have cleared the Arcturus, if nothing unforeseen had happened, in the position in which she approached. When she was about a length and a half from the Arcturus she took a sudden sheer —bow to port and stern to starboard. The order to port a little was given, and, when she did not respond, the wheel was thrown hard aport. She continued to head toward the Arcturus. In an effort to break the sheer, the engines were reversed to full astern and the starboard anchor was dropped. Notwithstanding this, the Crowley struck the Arcturus about 80 feet forward of her stern, doing the damage herein complained of. Both ships docked unassisted, and the Crowley made her scheduled trip after temporary repairs were made to her bow, but nothing was done to her steering apparatus.

Based on the testimony from the witnesses from the Crowley and upon the record as a whole, at the various speeds at which she was operating in the channel, it appears and I find that it took the Crowley about 3¼ minutes to travel from the outer buoys to the eastern end of the north pier, 4½ minutes thereafter until she reached the western end of the north pier, and 4½ minutes from that point to the point of the collision. Thus it was at least 9 minutes from the time the captain of the Arcturus saw the Crowley entering between the piers and the time the Crowley struck the Arcturus. During that period he did nothing to unlock the windlass and free the chain. He knew the Crowley was coming on; he had told her to do so. He might have freed the anchor chain in not more than two minutes and, with his engines running half speed forward, the remaining 60 fathoms of chain would have run out and the Arcturus would have been out of the channel and out of the way of the Crowley before she reached the point of the collision. He needed to move the Arcturus forward only 80 feet; the vessel could have moved forward 360 feet had the chain been freed.

The libelant asserts that the Arcturus was at anchor and stationary and in a helpless condition during the time that the Crowley was approaching through the channel, all of which was known to the Crowley; yet, notwithstanding, the Crowley came on at an unnecessarily high rate of speed and, under the conditions obtaining, was solely responsible for the collision.

■ Those in management of the Arcturus violated the rules of navigation, exercised bad judgment, and displayed poor seamanship in her navigation and management from the time the attempt was made to enter the harbor until the collision occurred. They knew the effect of the wind, for they had experienced difficulty in navigating the channel and in keeping within its boundaries. Yet, with the ship light and her bow high, they attempted to cut sharply around the buoy to enable them to forge ahead at right angles to the channel into the dock. The slightest attention to existing conditions would have warned the navigator of the impossibility of success of such a maneuver. What should have been expected happened. The strong wind caught her bow and made the turn impossible. Still in the channel, knowing the Crowley was following him in, instead of proceeding forward into the harbor where he had a basin two and one-half miles long and half a mile wide in which to turn, free of vessels and where he would have been out of the way of the oncoming Crowley, he dropped his anchor and checked the run-out of the anchor chain by locking the compressor and kept his engines running ahead and, with the anchor foul, refused to release the chain and run his vessel ahead. He thus deliberately blocked 150 feet of the 300 foot channel through which the Crowley was approaching. He was bound to know that the Crowley could not stop without being blown on the rocky shelf on the north side of the channel, that there was no place to tie up, and no tug available to pull her off the rocks if she stranded. He was bound to know that the Crowley had a right to assume that he would clear the channel and, in the absence of danger signals, to come on. Thus, if he was at anchor as he claimed, he deliberately anchored in a navigable channel, blocking it to the extent of one-half of its width, and prevented or obstructed the navigation of other vessels therein in direct violation of section 15 of chapter 425 of the Act of Congress of March 3, 1899 (33 U.S.C.A. § 409). There was no emergency requiring the Arcturus to drop her anchor or to anchor as she did; it was entirely unnecessary to do so; it was done purely as a matter of convenience, and, having illegally anchored with his vessel blocking the channel when he finally brought up, the master of the Arcturus made no effort to get out when he had ample time so to do. In this the Arcturus was guilty of culpable negligence (United States v. St. L. & M. V. Transportation Co., 184 U.S. 247, 255, 22 S.Ct. 350, 46 L.Ed. 520; The Strathleven [C.C.A.] 213 F. 975), and under the circumstances was not entitled to and cannot claim the privileges of an anchored vessel as between herself and the Crowley (Culbertson v. The Southern Belle, 18 How. 584, 15 L.Ed. 493; The Clara, 102 U.S. 200, 202, 26 L.Ed. 145; United States v. St. L. & M. V. Transportation Co., supra). Furthermore, she was not "anchored" as the term is generally understood. Her engines were shoving her forward against the anchor. The purpose was not to anchor or to come to rest. Nor was she at anchor under the rules. Despite the fact that the anchor was down and fouled, she was under way as provided in chapter 64, § 1, of the Act of Congress of February 8, 1895, 33 U.S.C.A. § 242; The Nimrod (D.C.) 173 F. 520, 522; The Chas. C. Lister (C.C.A.)

182 F. 988; The Ruth (C.C.A.) 186 F. 87. By her own act she not only partly obstructed the channel and made it difficult for the Crowley to pass, but set up currents from her propellors against the northerly bank of the channel which, returning, undoubtedly caused the Crowley to sheer.

Furthermore, when the anchor fouled and thereafter during the nine minutes before the arrival of the Crowley, the captain of the Arcturus should, under elementary principles of navigation, have thrown his helm either hard to port or hard astarboard and sent his engines full speed ahead. The result would have been to swing the ship out of the channel and there was ample room either to the east or west to do so. Again, had he sent his engines full speed ahead when he first attempted to make the turn, with the wheel hard astarboard (rudder to port), the ship would have swung and cleared the channel without the use of the anchor at all. He acted as he did, as he testified, only for his own convenience in the effort to unnecessarily turn at right angles into the dock. Acting solely for his convenience furnishes no excuse for his negligent acts, and he must accept responsibility for the ultimate results. The City of Birmingham (C.C.A.) 138 F. 555, 559.

The libelant asserts that after the anchor had fouled and the vessel had stopped, it was impossible for her to move out of the channel. It has already been pointed out that the Arcturus might have been moved out of the channel by the simple expedient (1) of releasing the anchor chain and letting it run out, or (2) of throwing his helm hard astarboard or to port and sending his engines full speed ahead. He did neither, but calmly watched the Crowley forge ahead on his own invitation, as he claims, without checking, while his own propellers were setting up currents which made the safe navigation of the Crowley past his boat extremely hazardous, if not impossible.

If the Arcturus was helpless, as she claimed, it was her duty to give adequate warning by a danger signal at a time when, under the circumstances, it might be expected that it would be heard. The Bowden (C.C.A.) 78 F. 649, 651; The Hesperos (C.C.A.) 265 F. 921; The F. W. Wheeler (C.C.A.) 78 F. 824, 828; The Maurice B. Grover (D.C.) 79 F. 378, affirmed 92 F. 678. She claimed to have sounded a danger signal when the Crowley was about to enter between the piers, some 6,000 feet away. This was not heard by the Crowley. The direction of the wind would carry the sound away from the Crowley. Jets of steam were seen, but they had no meaning to the Crowley as a danger signal. Although the Crowley continued to come on, the Arcturus gave no other danger signal. The three-blast signals were meaningless as danger signals, and were not intended as such or so understood. They meant, according to local custom, that everything was all right and to come ahead. The captain of the Arcturus insisted the three-blast signal was an invitation to come on slowly. The Crowley understood that it was commonly used where there was no fog by one vessel to invite another to come forward. It was unknown to the rules, except as a fog signal. The Crowley's speed, if dangerous 6,000 feet away, became increasingly dangerous as she approached the Arcturus if maintained undiminished as claimed by the latter. Still no danger signal was forthcoming. No one on the Crowley saw the black ball on the Arcturus. It may not have been up at all. When the last three-blast signal was given, the Crowley did not see the anchor chain of the Arcturus or know she was creating cross currents in the channel. Her officers did not know this until just before the sheer occurred. They then did everything possible to avert the collision. The only plausible theory by which this sheer of the Crowley can be explained was that it was due to the cross currents set up by the propellers of the Arcturus. Tested by the evidence and by the facts and circumstances surrounding the collision, these cross currents were the sole cause of the sudden and uncontrollable sheer of the Crowley, without which the collision would not have occurred.

The rule that a moving vessel which collides with one at anchor or at rest in a proper place must exonerate herself from blame by showing that it was not within her power to prevent the collision, unless the vessel at rest was at fault or the collision was the result of inevitable accident has no application under the facts in this case, for the Arcturus was in the wrong place and was otherwise at fault. The Lehigh (D.C.) 12 F.Supp. 75, 82, and cases there cited. It is claimed by the libelant that the speed of the Crowley was a contributing cause of the collision. With this contention I cannot agree. At and for some five minutes, at least, before the time of the

collision the Crowley was moving at a speed of not more than six miles per hour. She had no notice of danger and, considering the physical conditions in and about the channel, its depth and width, the force and direction of the wind and the channel currents, her draft, size and load, she was not negligent in maintaining the speed she did.

It cannot be inferred that the Crowley could have successfully cut in close to Black Can Buoy No. 5 if navigating at a lower speed and thus have safely passed to the port of the Arcturus, in view of the utter failure of the Arcturus to make such a right angle turn. Furthermore, no occasion existed whereby the Crowley was called upon to elect to make such an attempt. As has already been pointed out, while the Crowley was still nearly a mile from the Arcturus and during all the time intervening between the first three-blast signal of the Arcturus and the collision, the captains of both vessels were agreed that the Crowley should come on and that she could safely pass under the stern of the Arcturus. But, whatever the speed, it had nothing to do with the collision. It is conceded that, had there been no sheer of the Crowley, the collision would not have occurred. Whatever her speed, it did not cause or contribute to the sheer.

If the Crowley had any burden to show that she was not at fault on the theory that the Arcturus was at anchor or at rest, she clearly showed that she was not at fault as to any matter that caused or contributed to the collision. From any aspect of the case, I am satisfied that the Crowley exercised all the care required of her. In my opinion the Arcturus was solely at fault.

The libel of the Arcturus should be dismissed, and the Great Lakes Transit Corporation should recover the amount of its damages, with costs. The question of damages is referred to Charles Desmond, Esq., of Buffalo, N. Y., as commissioner, to compute and report in accordance with the practice in this court.

The foregoing will be deemed to constitute the findings of fact and conclusions of law herein in conformity to the provisions of Admiralty Rule 46½ (28 U.S.C.A. following section 723), and an order to that effect may be entered, unless request, upon notice, is made within ten days of the date of this decision for additional findings.