GREEN *v.* STEAMER HELEN.

*(District Court, D. Maryland.* March 24, 1880.)

COLLISION—NEGLIGENT RATE OF SPEED—UNLAWFUL ANCHORING OF VESSEL—DAMAGES.—Where a steamer collides with a vessel, unlawfully anchored in an improper and dangerous place, while negligently maintaining too high a rate of speed, the damages will be equally divided.

POLICE REGULATION—STATUTORY PROVISION CONSTITUTIONAL.—An act of the legislature of the state of Maryland, (1867, *c.* 295,) declaring that it should not be lawful to anchor any boat in a river of the state, within certian prescribed limits, in order to keep the channel free from obstructions to navigation, is not unconstitutional, as an attempt to regulate commerce among the several states, where such provision does not conflict with any regulation of congress.*

In Admiralty.

*Handy & Hodson,* for libellant.

*Crisfield & Dennis,* for claimant.

MORRIS, J. The allegations of the libellant are that his schooner, the Wm. H. Roach, 28 tons register, of Crisfield, Md., was, on the morning of the second of December, 1878, lying in the harbor of Crisfield, at anchor, in a manner not contrary to law, having on board 900 bushels of oysters; that about 5 o'clock A. M., while it was yet dark, the steamer Helen came upon her from the south-west, out of the usual track

*See *Heerman* v. *Beef Slough Manufacturing, etc., Co., ante,* 145.

of said steamer, at a high rate of speed, and ran into and so damaged her that she soon filled with water and sank; that at the time a proper light, as required by law, was brightly burning in her forward rigging, which could have been easily seen, with proper vigilance, by those navigating the steamer, in time to have avoided the collision.

The claimant, by his answer, alleges that the steamer Helen, of 550 tons, was on her usual route from Baltimore to Crisfield, expecting to arrive at the railroad wharf at Crisfield on her schedule time of 5 o'clock; that the night was very dark, with occasional rain, and the wind blowing hard from the southwest; that the steamer was proceeeding cautiously, at a rate not more than sufficient for steerage, with two men on the lookout far forward in the bow, one on each side, and with her captain and pilot in the wheel-house; that when on her usual course, about the center of the channel, and about 200 yards from the railroad wharf for which she was steering, the lights of two vessels were seen, one on her port and one on her starboard bow, but with ample room to pass between them; that when nearly abreast of the two lights the lookouts and officers saw the reflection of the steamer's head-light on the masts of a vessel under the steamer's bow, not more than 75 to 100 feet ahead, which afterwards proved to be the libellant's schooner Roach; that the engines were at once reversed, but there was not time to avoid the collision, although the headway of the steamer was checked, so that the blow was not violent; that the Roach was lying across the channel, and in the usual track of the steamer, and had no light upon her, and was so heavily ladened that not more than a foot of her hull was above water, and the night was so very dark that it was impossible to have seen her sooner; that the schooner was anchored in a place forbidden by law, and although in a dangerous and forbidden place had no lookout or watch; that the steamer, knowing it was the constant habit and practice of the Roach and other vessels of her class to anchor in that part of the channel, although by law forbidden so to do, used every precaution to guard against accident, but

that no seamanship on her part could have prevented the collision.

The first inquiry suggested is, was the schooner's light burning? It is proved that the lamp was a proper one, and was put up in a proper place. It was found after the schooner sank hanging in the fore rigging, and then had some oil in it and a good wick. There is testimony that it was seen during the early part of the night, and there is testimony that it was burning at the time of the collision, which I will briefly state:

Abel Riley, a colored seaman on the schooner De Bow, anchored next the Roach, about 30 yards off up the stream, says he heard the collision and came up on deck; that none of the Roach's crew had then come up, and he saw her light, and that it was put out by the water when she sank.

Francis Powell, a seaman on board of the Cuba, anchored about 40 yards down the stream from the Roach, came on deck and saw the steamer coming in, and watched her until she passed, and says that the Roach's light was burning. John Thomas Allen, a colored man, says he was on the railroad wharf waiting for the steamer, and saw the light from the wharf at about 4 o'clock. Thomas Conner says he saw it from the shore about 3 o'clock. James C. Simonson, assistant postmaster, says he was waiting for the steamer and saw the light at 5 minutes before 4 o'clock from the railroad ticket office. George C. Carroll, on board the Sailor's Delight, says he saw the light between 4 and 5 o'clock. Edward Evans, on board the schooner De Bow, says he saw the collision and saw the light. William L. Sterling was on the wharf and says he saw the collision and saw the light burning.

On the other hand, there were on the steamer two very competent men (one of them the mate) stationed, one on each side of the bow, near the stem, acting as lookouts. They saw the lights on the two vessels, one on either side of the Roach, but, although intently watching, swear they could see none on her, and could see none before or after the collision. The captain and pilot, although they saw the other lights, swear

they saw none on the Roach, and so swears the man who was standing on the hurricane deck near the pilot house. The steamer was steered between the two lights, which, it appears, were the lights on the Cuba and the De Bow, because, as they say, it was a dark space in which there was no light. All these persons on the steamer testify that they saw the masts of the Roach as soon as revealed by the steamer's head-light, and all five of them testify that from the time the schooner's masts were revealed until she sank they could see no light on her. Charles Simmons, the watchman on the railroad wharf, who was standing in an excellent position for observation, watching the steamer coming in, and swinging a light for her guidance to the wharf, testifies that he saw the two lights on either side of the steamer and dark space between, into which she steered; that he then heard the crash of the collision, but saw no light of any vessel there.

As to all the libellant's witnesses who say they saw the light from the shore they were at considerable distances, varying from 500 to 1,000 feet. There were several vessels lying not far apart; their position had shifted with the wind, the darkness was such that they could see nothing but the lights, and they may easily have been mistaken as to which vessel the light was on. As to his other witnesses, their opportunities for seeing the light were no better than those of the officers and men on the steamer.

It is not necessary for me to discuss why I am disposed to give more or less weight to the statements of different witnesses who have testified with regard to the light; but I may say, generally, that it appears that there is such a state of feeling between the oystermen of Crisfield and those navigating the steamers running to that port, that the witnesses on each side of this controversy, whether on board the vessels that came in collision or not, would seem to be open to pretty much the same liability to the influences of bias and prejudice. The captain of the Roach was not on board of her, and no one had been since Saturday night, except five of her colored crew, who were sound asleep until roused up by the collision. Of these two were examined, but hey did not say whether or

not they saw the light when they came up on deck after the collision. In this conflict of testimony I find myself unable to arrive at a satisfactory determination of the question whether or not, at the time of the collision, the schooner's light was burning.

When, however, a vessel in motion comes into collision with one at anchor, the presumption is that it was the fault of the vessel in motion, unless the anchored vessel is in an improper place; so that, in the inconclusive state of the testimony with regard to the light, it becomes of great importance to determine where the schooner was at anchor, and whether she was lawfully there. The natural channel of the Little Annamessex river, on which is the town of Crisfield, was found insufficient for the steamboats and other vessels attracted by the railroad which terminates there. With the aid of appropriations from the general government the channel was dredged out so that now there is, from Tangier sound to the railroad wharf at Crisfield, a channel about 300 feet wide and from 10 to 13 feet deep.

The legislature of Maryland expressed its sense of the great importance of preventing this channel from being filled up and keeping it free from obstructions to navigation by passing the act of 1867, c. 295, by which penalties are enacted against throwing into it any substances tending to fill up the river, and by which it is declared that it shall not be lawful to anchor any boat in said river between the railroad wharf at Crisfield and Tangier sound, in the track of any inward or outward bound vessels, and imposes a fine of not less than $20 nor more than $100 for every such offence; further declaring that if any boat, while anchored in the river contrary to said act, shall be collided with and damaged by any inward or outward-bound vessel, the owner thereof shall not be entitled to recover for any such loss, but said act and the violation thereof shall be a justification of such inward or outward-bound vessel so colliding. This dredged channel is not of great length, and is in fact, more of the nature of a canal than a river. The danger of anchoring in it is apparent, and must have seriously impressed the members of the

legislature, or they would hardly have thought necessary the extreme penalty which the act prescribes.

Much of the testimony of the libellants was directed to establishing the location of the Roach in the river at the time of the collision. I am satisfied that the Roach, on Saturday evening, cast anchor near the south-east edge of the channel, about 600 feet from the railroad wharf, and from 400 to 500 feet from Rice's wharf. The wind was then north-east, which caused the vessel to tend parallel with the channel, and down the stream. The Roach drew eight feet of water, and the proof shows that 30 feet eastward of the edge of the channel from this point the depth of water does not exceed six and one-half feet.

As the captain of the Roach was very familiar with the river, and the depth of water, it seems hardly credible that he would anchor his vessel to remain from Saturday night until Monday in a place where, if the wind went around to the northwest, she would have grounded. I am satisfied she was anchored somewhat to the north-west of the edge of the channel. The wind changed on Sunday night, and at the time of the collision was blowing hard from the south-east, which tended to carry the Roach directly across the channel. The channel there is about 425 feet wide. The Roach is 50 feet in length, and her cable was 120 feet, so that even if anchored on the very edge of the channel she must have been lying about 170 feet off from it, across the channel, which would put her very nearly in the center.

It is urged that this was not the usual track of the steamer, and that she was in the habit of coming in by a course further to the westward; but it could not have been much to the westward, and it would, I think, be unreasonable to restrict the steamer, on a very dark night, to pursuing her course within any such nice limits as that would imply.

I find, therefore, that the schooner was, in the language of the act of 1867, "anchored in the track of an inward-bound vessel, between Tangier sound and the railroad wharf," and that she was, therefore, unlawfully so anchored.

With regard to the application of the act of 1867 of the

general assembly of Maryland to this case, two objections are made: *First,* that it is an unconstitutional attempt of the state to interfere with the powers delegated by the constitution to congress to regulate commerce among the several states. Undoubtedly it has been held that "commerce" includes navigation and every species of commercial intercourse, (9 Wheaton, 1,) but it has also been held that, until congress does exercise the power given to it in such way as to manifest the intention to supersede or prevent state legislation, the states may, by law, prescribe such police regulations as are necessary to prevent the obstruction of its harbors and navigable waters, and the safety of vessels lying at anchor or moving thereon. These regulations have been held constitutional, and have been recognized by the admiralty as imposing duties on vessels which must be complied with. *The General Clinch,* 21 How. 184. In Cooley's Constitutional Limitations it is stated, as the result of the decisions, that "the state has the same power of regulating the speed and general conduct of ships and other vessels navigating its water highways, that it has to regulate the speed and conduct of persons and vehicles upon the ordinary highway, subject to the restriction that its regulations must not come in conflict with any regulations established by congress for foreign commerce or that between the states."

I am of opinion that so much of the law as declares in what parts of the Annamessex river it shall not be lawful for vessels to anchor is a constitutional exercise of the rights of state legislation which the Roach was bound to observe.

As to the penalties prescribed by that act for violation of its provisions, they cannot be enforced in the admiralty. This court must apply to the case the general maritime rules applicable to a collision between two vessels, one of which is anchored in an improper place, not regarding so much of the act as declares that the vessel unlawfully at anchor shall in no case be entitled to recover for any loss resulting from a collision. *The Gray Eagle,* 9 Wall. 510; *Williamson* v. *Barrett,* 13 How. 109; *The Continental,* 14 Wall. 359.

The *second* objection urged to the act of 1867 is the con-

tention that it has been superseded by the acts of the general assembly of Maryland of 1872, chapters 151 and 409. The first is an act to incorporate the town of Crisfield, and provides that the town commissioners may ascertain the depth and course of the channel of the harbor and river Annamessex, and fix buoys for facilitating the navigation thereof, and may cause the harbor to be cleansed and cleared of all obstructions, whether from vessels sunk or any other cause, and may require the wharves to be kept in repair. Chapter 409 is an act to define and preserve the harbor of Crisfield, and the Little Annamessex river in Somerset county, and provides that certain commissioners shall define and establish the lines of said river to which wharves and other improvements from either shore may be erected, and provides penalties for building in violation of such established lines, and for throwing into the harbor thus defined anything tending to fill up or obstruct the same.

Neither of these acts, so far as I can see, either conflict with or supersede the provision of the act of 1867, that no boat shall anchor in the track of vessels between Tangier sound and the railroad wharf at Crisfield.

It is not shown that, under either of the two later acts, any attempt has been made to set apart any anchorage for vessels. There was some testimony to show that an officer of the corporation of Crisfield had notified vessels that they must not cast anchor in the basin between certain wharves, but there was no evidence to show that the place where the Roach was lying had ever been, by any color of authority, designated as a proper anchorage for vessels.

I now come to consider whether there was any fault on the part of the steamer which contributed to cause the collision; for, although the Roach was anchored in an improper and dangerous place, the general maritime rule is that, whether the anchored vessel is in an improper place or not, the vessel in motion must avoid her, if practicable, and can only exculpate herself by showing that it was not in her power, by adopting any practicable precaution, to have prevented the collision. *The Clanta and The Clara,* 23 Wall. 14.

It is admitted in the answer that the steamer was about 500 feet from her wharf in the harbor of Crisfield; that it was known to those navigating her that it was the constant practice of the Roach and other vessels of her class to anchor in that part of the channel; but it is alleged that she was proceeding cautiously and at a slow rate of speed.

Let us see how the testimony supports this allegation as to the rate of speed. The captain of the steamer says that when they saw the masts of the Roach, about 75 feet off, the steamer was going the usual speed which she maintains while coming up the river; that is to say, from six to seven miles an hour. Out on the bay, he says, they try to make 10 miles an hour. The engineer says that on the bay they were making 32 revolutions of the wheel a minute, and on the river, 28 revolutions, and that at the time he got the signal to reverse, just before the collision, they had not slowed from the speed they had been making on the river, and were going, he thinks, six and a half miles an hour. The Helen is a side-wheel steamer, quickly stopped, and, even at her then rate of speed, was so far checked before striking the Roach that the direct effect of the blow was not great.

I am satisfied that if she had been proceeding at a slower speed the damage must have been very trifling. In my judgment, under all the circumstances and considering the obstructions they knew she was likely to encounter, she was maintaining too great a speed. The night was very dark. She was steering for her wharf. They knew that the harbor is very contracted, and that small vessels would very likely be in her track, and yet she had not slowed from the speed she had maintained the whole length of the river. *The Corsica,* 9 Wall. 634. In the harbor of Baltimore an ordinance provides that no steamboat of 150 tons and upwards shall proceed at a greater speed than 10 revolutions of her wheel per minute, which serves to indicate the rate of speed which experience has shown to be safe in a narrow harbor in the day-time.

It results, from these considerations, that both vessels were in fault, and that the damages must be equally divided.

The steamer was not injured at all, so that the only damage to be determed is the loss sustained by the owners of the schooner. The libellants' itemized account of loss amounts to $1,407. This exceeds, in some of the items, what, in my judgment, is proper to be allowed. The 900 bushels of oysters are charged at 30 cents a bushel, but the proof is, I think, that their value, as they lay in the vessel, did not exceed 25 cents; this would result in à deduction of $45. Two months' detention of the schooner is charged at $600. Two months was, I think, an unnecessarily long time to be consumed in raising and repairing the schooner. It could have been accomplished in less than half the time, and I deduct $300 from that item. This reduces the account $345, leaving $1,062 as the damage.

I will sign a decree against the stipulators in favor of the libellants for half that amount.