## THE MAURICE B. GROVER.

### (Circuit Court of Appeals, Second Circuit. January 25, 1899.)

### No. 11.

1. COLLISION—STEAMER AGROUND—CARRYING SAILING LIGHTS.
   Under the navigation rules on the lakes (Act Feb. 8, 1895 [28 Stat. 645] Rules 1, 3), a steamer should not carry sailing lights when aground, and is in fault for a collision resulting from her misleading an approaching vessel by such lights.

2. SAME—SIGNALS.
   A passing steamer, having the right of way, is not in fault for a collision because she failed to give the signal to indicate which side she expected to take, when the other vessel was aground, and her movements could not have been influenced by such signal.[1]

3. SAME—ERROR OF JUDGMENT—ACT IN EXTREMIS.
   One of two passing vessels cannot be held in fault for a collision merely because of an error on the part of her master, where he acted in an emergency, and upon a reasonable judgment, in view of the circumstances as they were presented to him at the time.

Appeal from the District Court of the United States for the Northern District of New York.

Norris Morey, for appellant.

Harvey S. Goulder, for appellee.

Before WALLACE and LACOMBE, Circuit Judges.

PER CURIAM. The circumstances of the collision are sufficiently stated in the opinion of Judge Coxe (79 Fed. 378), and we agree substantially in his conclusions of fact. We also agree in the legal conclusions that the Moran was in fault, and the Grover should be exonerated from liability, though not altogether with the reasons assigned in the opinion. The facts, briefly stated, are these: The collision took place in St. Mary's river, opposite the island known as "Sailor's Encampment." The river around the island is shallow, has a rocky bottom, has a current of two miles an hour, and is navigable by vessels of size only in the narrow channel constructed by blasting out the rock. The Moran, bound up the river, ran aground at the westerly side of the channel, below what is known as the "Crib," and lay there, with her stem projecting at right angles with the channel, until about dusk,—a period of about two hours,—until the collision. The channel at that point, for half a mile up the river, and running in a northerly direction, is straight, and then deflects sharply to the west around Sailor's Encampment, and below the crib runs southerly a short distance, and turns again somewhat abruptly to the westward. The Moran's stem projected so far into the channel as to very seriously impede the maneuvers of vessels descending the river in making

[1] As to signals of meeting vessels, see note to The New York, 30 C. C. A. 630.

the turn below the crib. At all times navigation at that point was difficult, and it had become customary in 1895 and 1896 for ascending vessels to lie still below the turn, and wait for the descending vessel to pass. The place where the Moran was grounded was near the location sometimes selected by vessels thus awaiting descending vessels. The Grover, as she rounded the northerly side of Sailor's Encampment, gave the customary whistle at the bend to indicate her approach. Those in charge of her navigation saw the Moran, saw her masthead and red lights, saw that she was stationary, although her propeller was moving, and assumed that she was an awaiting vessel. They did not observe her vigilantly, and devoted themselves to the navigation of their own vessel until they passed a dredge lying in the channel about halfway between the bend and the Moran, and then they gave and maintained vigilant attention to the Moran, and made preparations to pass her. As she approached nearer, her master concluded that he could not pass across the bows of the Moran and make the channel turn with safety to his own vessel. He therefore increased the speed of the Grover, which up to that time had been proceeding very slowly, and, when she was about 300 feet above the Moran, ordered her helm hard a-port, and soon after her engines backed, intending to pass the Moran on the port side, and expecting to see the Moran go ahead under a helm to throw her stern to starboard and out of the way of the Grover. Whether this maneuver would have been successful, if the Moran had been free and had made such a maneuver, is doubtful. She could not assist the Grover, and the latter, though only under sufficient motion to give steerageway, struck the Moran nearly amidships on the port side. We are convinced that the master of the Grover acted upon his best judgment at the time he starboarded the course of his vessel, and the proofs do not satisfy us that she could have passed in front of the Moran's bow, and made the turn in the channel, without risk of running upon the rocks. If those in charge of the Grover had known, or should have known, the Moran to be aground, the Grover would have been in fault for not reversing when or before she got opposite the dredge; and the most serious question in the case is whether they were not negligent in assuming that she was an awaiting vessel. She was lying nearer the crib than awaiting vessels usually did, but vessels had passed near that place before, and the rock upon which she grounded was not generally known to navigators. If the water had not been lower than usual, she probably would not have grounded. The master of the Grover was an experienced navigator, familiar with the locality; and there is not the slightest doubt that he and the others on the Grover, after carefully observing the Moran, continued to think she was an awaiting vessel. They undoubtedly assumed that she was lying further below the crib than she really was, but miscalculations of that sort are not inconsistent with the exercise of reasonable vigilance. Seeing her sailing lights burning, they had a right to suppose she was not aground until the contrary became manifested. Upon a careful reading of the proofs, we conclude that those in charge of the Grover were justified in their assumption that the Moran was an

awaiting vessel, and in relying upon that supposition until it was too late to take any more effective measures for avoiding collision than those which were taken. The Moran was in fault because she was under her sailing lights while aground. The Lorne, 2 Stu. Adm. 177. Rule 3 requires the lights to be carried by steam vessels "when under way," and by rule 1 a vessel is not under way for the purpose of carrying lights, when she is grounded. Act Feb. 8, 1895 (28 Stat. 645), regulating navigation on the Great Lakes and their connecting waters. By carrying her sailing lights, the Moran advertised herself as being under way, and actually misled the Grover.

It is urged that the Grover was in fault for omitting to give the signal prescribed by rule 24 (28 Stat. 649), by which the descending vessel is given the right of way, and required, when two steamers are meeting, to indicate which side she elects to take. This fault is not charged in the libel. It is doubtful whether the rule applies to a case like the present, where one of the vessels is lying still. The failure to give it in this case did not influence, and could not have influenced, the movements of the Moran. Whether the Moran could have given any signal to the Grover to indicate her inability to control her movements we are unable to say. The court below, was of the opinion that when she heard the signal given by the Grover, while rounding the bend, she ought to have sounded an alarm signal. The case is not one covered by any formulated rule; and while it may be that such a signal might have led those in charge of the Grover to apprehend that the Moran was not under control, and to take earlier precautions for avoiding her, it is so doubtful whether they would have understood the signal to be meant for them that we are indisposed to treat the omission as a fault contributing to the collision. It is probable that the Grover could have passed across the bow of the Moran and made the turn in the channel safely. Other vessels had done so while the Moran was aground, but at that time she did not obstruct the channel to the same extent, and it does not follow that the Grover could have done so because the others did. The Grover was so heavily laden that she might have failed, although the others succeeded. We cannot resist the conclusion that the master of the Grover acted upon a reasonable judgment, in view of the circumstances as they were presented to him at the time; and, if he made a wrong judgment, it was an error, and not a legal fault. The decree is affirmed, with costs.