## THE MALING.

## THE S. A. McCAULLEY.

(District Court, D. Delaware. June 1, 1901.)

1. PUBLIC IMPROVEMENTS—NEGLIGENCE OF CONTRACTORS—LIABILITY.

While damage or loss resulting from the making with proper care and prudence of a public improvement pursuant to law is damnum absque injuria, contractors for such improvement, to avoid liability for resultant damage, must as far as practicable employ reasonably safe means and methods, and the doctrine of damnum absque injuria is wholly inapplicable where loss results to third persons from the negligent employment of unsafe methods unnecessary to the conduct of the work.

2. COLLISION—IMPROPER SIGNALS.

A close and literal compliance with the requirements of the regulations for preventing collisions is imperatively demanded, and the use by a vessel at anchor, and not in extremis, of a passing signal is a gross fault.

3. SAME—MUTUAL FAULT—DAMAGES.

As a general rule, subject to qualification in special cases, where three vessels are all in fault for a collision resulting in damage to only one of them, the total damage and costs should be equally divided between all of them; but where one of them, other than the damaged vessel, although not so related to or connected with the latter as to be a mere inert, passive or helpless instrument, without accountability for the movements or signals of the latter, nor her mere servant, but a free agent, not bound to obey the directions of the latter, has been induced by the latter to do the precise thing which constitutes her fault, the share of the damage and costs which she would otherwise be obliged to pay must be borne by the damaged vessel causing her to commit such fault.

(Syllabus by the Court.)

In Admiralty.

Lewis C. Vandegrift, for Alexander Burke.

J. Parker Kirlin, for the Maling.

John F. Lewis and Francis C. Adler, for the S. A. McCaulley.

James J. Macklin, for Norwood Insurance Company and others.

BRADFORD, District Judge. On the evening of November 26, 1897, the British steamship Maling collided with the dredge Pacific while at anchor in the Delaware river a short distance above the mouth of the Christiana river, striking the dredge on the starboard quarter and doing serious damage. At the time of the collision the steam tug S. A. McCaulley was lying on the westerly side of the dredge, not at anchor, but fastened to the dredge by a line. The master of the dredge filed his libel against the Maling on the night of the collision. Subsequently, on the petition of the claimant of the Maling, the tug was brought in as a defendant under rule 59 in admiralty, and afterwards certain marine insurance companies which had severally paid to the owner of the dredge certain moneys on account of the damage resulting from the collision against which they had insured him, were joined as co-libelants with the master. For several months prior to the collision the dredge had been employed under a contract with the United States government in deepening a certain part of the ship channel on the westerly side of the Delaware river, known as Cherry Island channel or Cherry Island cut. The

work of dredging had been carried on along and parallel to the line or, as it .has been termed, the axis of the Edge Moor range lights. The water in the dredged portion of the channel had a depth of twenty six feet at mean low water, and such dredged portion above the point where the dredge had ceased to work on the day of the collision was two hundred and sixty five feet wide, ninety feet being on the westerly, and one hundred and seventy five feet on the easterly side of the axis of the range lights. Below that point the dredged portion of the channel was two hundred and twenty feet wide, ninety feet being on the westerly, and one hundred and thirty feet on the easterly side of such axis. The dredged portion of the channel extended from a point about a mile and a third above to a point nearly a mile below the position of the dredge when it last stopped work before the collision. In that position its bow pointed down the river, its sides were parallel to the axis of the range lights, and it was distant from such axis about one hundred and thirty feet eastwardly. The dredge was kept in place by means of a stern line, a starboard breast line, a starboard quarter line, a port breast line, and a port quarter line, each attached to its own anchor. During the progress of the work on the easterly side of the axis of the range lights, at the close of each day's dredging the dredge was moved some distance to the east by hauling on the port or easterly lines, the starboard or westerly lines being slackened or paid out at the same time. Both while at work and during the night the starboard lines were so weighted as to rest on the bottom. The port lines, if weighted at all, were not sufficiently weighted to cause them to rest on the bottom. The object in hauling the dredge to the eastward at night was to remove it from that portion of the channel which was most frequently traversed by steam vessels and other craft of considerable draft. On the day of the collision the dredge was hauled eastward shortly before five o'clock in the afternoon to the place of collision, a distance of about two hundred and twenty feet from her position while at work, or to a point distant about three hundred and fifty feet from the axis of the range lights. The collision occurred shortly after six o'clock at which time the bow of the dredge was pointing down the river, her sides being parallel to the axis of the range lights. For some ten or fifteen minutes immediately preceding the collision the tug McCaulley had been lying alongside of the dredge, made fast thereto by a line. During the progress of the work the principal employment of the tug was towing mud scows between the dredge and dumping ground. She had returned to the dredge after taking away a scow at the close of the day's work, and was waiting to take the master of the dredge ashore with the report of the government inspector in charge of the work. The Maling with a cargo of grain left Philadelphia at three p. m. on the day of the collision bound for Rotterdam. She is a steel vessel 325 feet long and 47 feet 6 inches in breadth of beam. She was on the day and at the time of the collision loaded by the stern, drawing 19 feet 6 inches forward and 20 feet 8 inches aft. On her way down the river she passed the red buoy opposite Edge Moor at or a few minutes before six p. m. This buoy was distant from the place of collision upwards of a mile and a third,

and probably a mile and a half. At the time of passing the buoy and until after the collision, all of the Maling's usual navigation lights were properly set and brightly burning. It was a dark but clear night, and there was nothing to obscure or obstruct the lights of the steamship from those on the dredge or the lights of the dredge from those on the steamship. It is averred in the libel and is not disputed that "the lights on said steamer were visible to those on said dredge for a couple of miles up the river before she reached said dredge and there was nothing that intervened between said dredge and said steamship to obstruct the view of the lights of said dredge from said steamship as said dredge was then and there lying at anchor as aforesaid." The tide was half ebb and running at about two and a half miles an hour. After the Maling rounded the red buoy and steadied herself in her new course the lights of the dredge bore about a point on her starboard bow. They were regarded at that time by those on the Maling as the lights of a vessel at anchor, and in fact were recognized by the pilot in charge of the Maling as the lights of the dredge. An overwhelming preponderance of evidence shows that the steamship from the time she steadied herself after rounding the buoy until she ported her helm, as hereinafter stated, steadily held her course, keeping the dredge a little on her starboard bow, and that had she continued to hold the same course instead of porting her helm the collision would not have occurred. But when she was between four and five lengths from the dredge she suddenly put her helm hard aport, swung to starboard and, narrowly failing to clear the dredge, struck it a glancing blow on its starboard quarter with the bluff of her port bow. What caused the Maling to port her helm is one of the vital questions in the case, and it is important to consider the circumstances under which it was done. Lockwood, the watchman on the dredge, testifies that when he first noticed the Maling she was coming down the river between Edge Moor and the dredge; that he first saw her white light and shortly afterwards a green light; that when he saw the green light he got his lantern "and started to wave it for her to go to the westward"; that he "saw she was making for the lines before I got the lantern waved for her to go to the westward"; that "the lines were out on the port side and the starboard side both, but on the starboard side they were sunken down"; that there was no danger of the cutting of the lines on the starboard side by passing boats because they were sunken; that there was danger of the cutting of the lines on the easterly or port side of the dredge if the Maling came too near on that side; that he waved the lantern because he "did not want him to run over those lines and cut us adrift"; that he meant by the waving of the lantern that those on the Maling should know that he wanted them to pass to the west of the dredge; that he did not see a red light on the Maling until after he had waved the lantern; that the Maling started to go to the westward as soon as he waved the lantern; and that he waved the lantern seven or eight times, and each time from east to west. The witness nowhere states either positively or as matter of belief that, if the Maling had held her course without porting her helm, she would have struck the dredge. The reason

and the only reason assigned by him for signaling the steamship to go to the westward excludes such an idea. Indeed, the facts as testified to by him demonstrate the physical impossibility of such a result; for prior to the porting of the Maling's helm he had seen of her two side lights only the starboard, and this was continuously visible for some time before she began to swing to the westward, during all of which time her port light was shut in, showing that at that moment she was considerably to the eastward of the dredge and on a safe course so far as risk of collision was concerned. A suggestion rather than a forcible contention is made on the part of the libelants that, if the Maling had held her course and struck the easterly port lines of the dredge, the latter vessel would have been drawn by the tension on the lines into collision with the former. But this is largely speculation, and receives but slight support from the evidence. It certainly does not represent the understanding of the watchman, whose fear was that the dredge would be cut adrift. The only line of the dredge struck by the Maling was the stern line and that parted. The suggestion may, therefore, be dismissed without further notice. There can be no reasonable doubt on the evidence that it was owing to the fact that the port lines of the dredge extended several hundred feet eastwardly and were not weighted so as to rest on the bottom, and consequently were liable to be cut asunder by a vessel passing close enough on that side, that the lantern was waved as a signal to the Maling to port her helm, and had it not been for the position of the port lines of the dredge no such signal would have been given. A seriously disputed point in the case is whether the tug McCaulley, almost immediately after the watchman began to wave the lantern on the dredge, did not blow a single blast as a signal to the Maling to pass to the westward. Careful examination of the direct and circumstantial evidence bearing on this point has convinced me that the tug did give such a signal to the steamship at that time. It is true that the master of the tug, while admitting that she blew a number of toots as a danger signal before the collision, positively denies that any single and independent blast was blown by the tug or that he heard any such blast from the Maling. There is also considerable testimony to the same effect from others on the tug and those on the dredge. The self-contradictions and general recklessness of statement disclosed in the evidence of the master of the tug largely detract from the weight it might otherwise possess, and much of the testimony from others tending in the same direction as that of the master, even when taken by itself, is loose, contradictory and unsatisfactory. By way of illustration, Charles, fireman on the tug, states in effect that he was at supper in the galley when he heard the tug blow four short blasts; that he paid no attention to this signal; that it was repeated and he then came out on deck; that it was customary for the tug to blow only one short blast in order to attract the attention of those on the dredge; and that the reason why he paid no attention to the first signal was that he thought it was given for that purpose. Lockwood, the watchman on the dredge, states in effect that he heard the tug blow four blasts before she tooted; that "they were longer than the blasts that she tooted" and had longer intervals between

them; that these blasts were blown about the time he was waving the lantern; and that "they were little longer blasts than toots would be. Toots come quick." Testimony of this kind is far from convincing, particularly in view of the fact that a clear preponderance of the evidence shows that the tug did not begin to toot until after the Maling had put her helm hard aport and had so far swung to the westward as to render both her side lights visible to those on the dredge and tug. The evidence on the part of the Maling is abundant and positive that the tug blew a single blast just after the watchman on the dredge began to wave his lantern, and that the Maling promptly answered with a single blast, and forthwith put her helm hard aport. Such affirmative evidence is much more persuasive than the negative testimony to the contrary. For the latter amounts only to a statement that the witnesses testifying did not hear a blast from the tug and an answering blast from the Maling. One may not hear a blast, or, if he hears it, it may not impress itself on his memory or even attract his attention; and a sincere statement by him that it was not blown may be perfectly consistent with mistake on his part. The evidence on the part of the Maling is supported by the inherent probabilities of the case. The tug and dredge were employed in different branches of the same work. The tug was then lying fast to the dredge waiting to take the master of the latter and the report of the government inspector ashore. The master of the tug knew that the port lines of the dredge extended eastwardly, were not sunken, and were liable to be parted by a vessel passing close to her on that side. He also knew that the watchman was waving his lantern as a signal to the Maling to pass to the westward. He says that before he blew the tug's whistle he had noticed "the watchman waving a white light for the steamer to go to the westward"; that he understood what the watchman meant; that the latter wanted the Maling to change her course and pass down to the westward; that "she was going to the eastward of the course that she should have been on"; that the dredge had lines out from her side several hundred feet to the eastward; and that if the Maling had changed her course to the westward when the tug first whistled she would have had no difficulty in safely passing to the westward of the dredge. He thus admits that in his opinion a signal to the Maling to change her course to the westward just after the watchman on the dredge had begun to wave his lantern would have been timely. On his own showing a violent presumption arises that he gave the signal which those on the Maling testify in the most positive manner they heard. The testimony on this subject of those who were in immediate direction and control of the movements of the Maling from the first waving of the lantern on the dredge until the collision is strong and convincing. In their case there is no room for mistake. The pilot, master, chief and second mates, helmsman and lookout of the Maling testify with clearness and particularity to the effect that, after the lantern had been waved on the dredge and considerably before the tug tooted or gave any danger signal, the tug gave a single blast which was answered by the Maling with a single blast, the helm of the latter vessel was immediately put hard aport and she began to

change her course to the westward. On the testimony as a whole I am satisfied that when the Maling was about five lengths or, roughly speaking, a distance of a third of a mile, from the dredge, the lantern was first waved; that very shortly afterwards and before the Maling had moved more than her own length the tug blew one blast which was forthwith answered by the Maling, and the helm of the latter vessel ported; and that it was only after the Maling had so far changed her course as to be bearing down on the dredge, with both her side lights visible, that the toots or danger signals were given by the tug. It seems that the significance of the waving of the lantern was not fully appreciated by all those on the Maling who saw it. Wright, the master, states that when he saw the lantern he asked the pilot what signal it was, and, the latter replying that he did not know, the witness said, "it looks as though he wants us to pass the other side;" and, further, that it was the blast from the tug in conjunction with the waving of the lantern that caused the porting of the Maling's helm. Clampit, the pilot, states that he does not think he would have ported the Maling's helm on account of the waving of the lantern had the tug not blown the blast which was answered by the Maling and that it was done on account of the blast following such waving. Richardson, the chief mate, states that the Maling did not respond to the waving of the lantern, and that it had nothing to do with the porting of her helm. It is, however, comparatively unimportant what impression the waving of the lantern produced on the master and chief mate. The pilot had sole charge and direction of the movements of the Maling and he acted upon the blast in combination with the waving. But it is immaterial so far as the decision of this case is concerned whether, on the one hand, the blast from the tug, or, on the other, such blast in conjunction with the waving of the lantern, was the cause of the porting of the Maling's helm. The tug and the dredge co-operated in effectuating an intent common to both of them, namely, the diversion of the Maling westward from her course, and the exposed condition of the port lines of the dredge was the proximate cause of the waving of the lantern and, in conjunction with such waving, of the blowing by the tug of the single blast immediately preceding the porting by the Maling of her helm. If that blast was the moving cause of the porting of the helm the dredge was in the same predicament on the question of the existence of liability on her part as if such moving cause had been the waving of the lantern. The contention is made on the part of the dredge and of the tug that the immediate cause of the porting of the Maling's helm was not the waving of the lantern or any blast from the tug, but the discovery by the pilot in charge of the Maling that she was considerably to the east of her proper course and in danger of running aground unless she promptly changed her course to the westward; and, further, that the only effect the waving of the lantern or any blowing of her whistle by the tug had was to arouse the pilot from his inattention and cause him by glancing at the range lights to discover and, when too late, attempt to rectify his error. But the position thus taken is conjectural and is opposed to the decided weight of the evidence, both direct and circumstantial. It has, indeed, no direct evi-

dence to support it. The principal, if not only, circumstance that lends some color to this contention is the fact that the pilot supposed that the dredge was lying on or nearly on the "ranges" or axis of the range lights instead of considerably to the east of that line, as was the fact. The essential inquiry in this connection is not whether the pilot was in error as to the location of the dredge relatively to the axis of the range lights, but whether, save for the waving of the lantern and the single blast from the tug, the Maling would not have continued on her course without porting her helm. It could not have been a matter of legal concern to the dredge or tug if the Maling by holding her course had run aground. It is clearly established, as before stated, that from the time the Maling turned the buoy off Edge Moor until she ported her helm after the blast from the tug, she steadily held her course, the dredge bearing a point or so on her starboard bow. The direct evidence shows, and it also appears from the fact that the Maling failed to clear the dredge after swinging several points on a port helm, that if she had continued to hold her course she could not have collided with the dredge, but, with sufficient depth of water, would have passed a short distance to the east of the latter vessel. The pilot testifies positively that, until he was diverted from his purpose by the single blast from the tug following the waving of the lantern, he had intended to hold the Maling to her course, without change before passing the dredge, and that at the then stage of the tide there was an abundance of water to allow her to pass at least two hundred feet east of the position of the dredge as shown by the evidence. If his testimony in this connection is to be accepted as true, it wholly excludes any idea that he thought either before or after the porting of the Maling's helm that she would incur or would have incurred any danger of running aground by holding to her original course. On the evidence I am satisfied, not only that the pilot thought at the time that there was enough water to allow the Maling to pass in safety on the easterly side of the dredge, but that he was right in so thinking. With an experience of more than twenty years in piloting vessels up and down the Delaware river it must be assumed that he had some competent knowledge of the general depth of water at and in the vicinity of the place where the dredge lay. It is true that he has a strong interest in maintaining the propriety of his course on the occasion in question. But this circumstance cannot of itself discredit his testimony. No actual measurement of the depth of the water at or to the east of the place of collision appears to have been made. The evidence discloses a number of loose expressions of opinion on the depth of the water, entitled to little or no weight; but it will be found that even these, when carefully considered as a whole, tend to sustain rather than contradict the pilot's statement. The dredged portion of the channel by no means included the whole or even the greater portion of the width of the channel navigable by vessels of considerable size; and the part of the channel where the dredge lay at the time of the collision and the adjacent waters on either side, although to the east of such dredged portion, were navigable and were navigated by such vessels. It is an error to suppose that

vessels in navigating a channel provided with range lights are under any legal or other obligation to confine their course to the line or axis of such lights. Range lights are in aid of navigation; but such a rule, if it existed, would tend rather to cause than prevent collisions. The dredged portion of the channel had a depth, as before stated, of twenty six feet at mean low water; but other portions of the channel could safely be and were properly navigated by vessels not of such draft as to be confined to the dredged portion. At the time of the collision the dredge lay 220 feet east of the easterly side of the dredged portion of the channel, yet the Maling did not run aground; and there is no satisfactory evidence that the water so shoaled eastward from the dredge as to prevent the free passage of a vessel of the draft of the Maling at the distance of two hundred feet or even much further from the easterly side of the dredge. At the time and place of collision the tide was about half ebb and four feet above mean low water. An official chart of the river corrected to October, 1898, was put in evidence by the libelant. There is no evidence of any deepening of the channel east of the easterly side of the dredged portion between the day of the collision and the issue of the chart as corrected, and in the absence of evidence no assumption to that effect can be made. It appears from that chart, not only that at that stage of the tide there was ample depth of water for the Maling to hold her course in perfect safety to herself and the dredge without going to the westward of the latter vessel, but that the Maling in swinging to starboard under a port helm passed without grounding through shallower water than any she would have encountered had she continued on her course without porting her helm. Under these circumstances it must be held that the porting of her helm was the direct and immediate result of the blast from the tug following or in combination with the exhibition of the lantern on the dredge. Was not the dredge at fault? Those in charge of her knew that the portion of the river in which she lay after being hauled eastward on the conclusion of the day's work was liable to be traversed by both steam and sailing vessels. It was the duty of her watchman to watch for, and guard against danger to the dredge and her lines from, approaching vessels. If it be assumed that the dredge had a right to occupy at night several hundred feet of the channel to the east with her unweighted lines and to stop the navigation by other vessels of the part of the channel so occupied, it was, at least, her duty either to indicate in some manner intelligible to approaching vessels, if practicable, the part of the channel so occupied, or promptly to use such proper signals as should be adequate to the protection, not only of herself and her lines, but of such approaching vessels. She did not adopt any means to inform other vessels of the length and position of her port lines. Possibly it was impracticable to do so. This rendered it all the more important that she should have been vigilant to avert disaster. Now her watchman certainly was negligent in the discharge of his duty. As soon as he saw the starboard side-light of the Maling he got his lantern, which was close at hand, and began to wave it in the manner before stated. It was

on his own showing the work of but a moment. When the lantern was first waved the Maling was about five lengths distant from the dredge, yet the evidence shows that the lights of the Maling could be seen on that clear night by those on the dredge from the time the former vessel turned the buoy off Edge Moor, and had the watchman been vigilant he should have noticed the green light of the Maling much earlier than was the case. Had he done so and promptly waved his lantern, although an improper and unauthorized signal, in all human probability no collision would have occurred. The Maling would have had ample opportunity to slow down or to clear the dredge to the westward. It seems to have been tacitly assumed on the part of the libelants that because the dredge was engaged in making a public improvement by the authority of the government no culpable negligence can be attributed to her on account of the disposition she made of her port lines, and that all vessels at their own peril were bound to avoid not only her but her lines, whether the position of the latter was or was not known to them. But such an assumption involves a clear misconception of the law. It is true that what the law authorizes to be done cannot be considered either illegal or wrongful, and that damage or loss resulting from the making with proper care and prudence of a public improvement pursuant to law is damnum absque injuria. But contractors for such an improvement, to avoid liability for resultant damage, must as far as practicable employ reasonably safe means and methods. The doctrine of damnum absque injuria is wholly inapplicable where loss results to third persons from the negligent employment of unsafe methods unnecessary to the conduct of the work. If it was necessary that the port lines of the dredge should at night extend several hundred feet eastwardly, there is no evidence showing or tending to show that those lines could not have been weighted and sunk to the bottom out of the way of passing vessels as were her starboard lines. In the absence of such evidence it cannot be assumed that it was impracticable so to dispose of the port lines. But even if it was impracticable so to weight and sink those lines there is nothing in the evidence showing or tending to show that it was necessary to have them extend so far to the east. The unnecessary obstruction of so much of the channel with unweighted lines was a negligent and wrongful act on the part of the dredge for the consequences of which the Maling should not be made to suffer unless she as well as the dredge was at fault. To this negligence were due both the waving of the lantern and the signal blast from the tug. But further, the waving of the lantern was an irregular and improper signal. Article 11 of the regulations for preventing collisions enacted by Congress (30 Stat. 96) prescribes the lights for vessels at anchor. Article 12 is as follows:

"Art. 12. Every vessel may, if necessary, in order to attract attention, in addition to the lights which she is by these rules required to carry, show a flare-up light or use any detonating signal that cannot be mistaken for a distress signal."

The use made of the lantern was wholly unauthorized by law. It was evidently a passing signal and, in view of the fact that the

vessel on which it was made was at anchor, was of a grossly misleading character. A close and literal compliance with the requirements of the regulations for preventing collisions is imperatively demanded. The waving of the lantern did not fall within the category of improper signals resorted to only in extremis. Certainly the mere fact that the lantern was waved is not evidence that matters were in extremis at that time; for it appears that it was customary on the dredge to wave it on the approach of vessels. As stated by the witness Coombs, "that was what the watchman was supposed to do, take his lantern and wave them off if they came near us." Further, it is admitted by the proctors for the dredge that "the distance between the vessels at the time the signal was given was ample to permit the steamer to avoid the dredge if the course of the former had been changed when the lantern was first waved." It was a fault on the part of the dredge to use a lantern as a signal and that action in combination with the blast from the tug which it induced was the direct cause of the porting of the helm of the Maling and the consequent collision. Section 6, c. 69, of the Delaware Revised Code contains the following provision:

"Vessels anchoring in any river, or creek, shall do so out of the channel, and as near the shore as they can with safety; and, when necessary, shall moor parallel with the channel, so as to leave a free passage, or they shall be held liable, as for gross negligence, in case of collision."

It may be a serious question whether this statute, in the absence of any regulation of Congress to the contrary, was not applicable to the dredge, and that vessel in fault for not complying with it. Green v. The Helen (D. C.) 1 Fed. 916. Anchoring in such depth of water as to permit the Maling to collide with her certainly was not anchoring out of the channel and as near the shore as could be done with safety. This case is clearly distinguishable from The Armonia, 81 Fed. 227, 26 C. C. A. 338, and The Le Lion (D. C.) 84 Fed. 1011. Here the dredge was anchored, not in the Delaware bay, but in the river proper and within the territorial jurisdiction of Delaware. But in view of the conclusions already reached respecting the fault of the dredge it is unnecessary to decide this question. The tug as well as the dredge was in fault and proximately contributed to the collision. A single blast such as was blown by the tug is prescribed by rule 1, article 18, of the regulations for preventing collisions, as the signal to be given in the case of steam vessels approaching each other end on or nearly so in such a manner as to involve risk of collision, and such signal and the answering blast of a similar character from the other vessel embody and express the intention and agreement of both vessels to pass to starboard or, in other words, on the port side of each other. It is a passing signal, altogether improper and deceptive when used by a vessel at anchor; and, if so used and a collision occurs, the burden rests upon the vessel using it clearly to prove that it did not contribute to such collision. Here the proof is the other way. It is unnecessary to discuss other alleged faults on the part of the tug.

I now come to the question whether the Maling was not also at fault. Article 25 of the regulations for preventing collisions (30 Stat. 96) is as follows:

"Art. 25. In narrow channels every steam-vessel shall, when it is safe and practicable, keep to that side of the fair-way, or mid-channel which lies on the starboard side of such vessel."

It is contended on the part of the Maling that this article applies only to the case of two or more vessels in motion and passing each other in opposite directions in narrow channels. But there is no such restriction in the language of the act nor is any reason perceived why such a restriction should be implied. The provision was, in my judgment, applicable to Cherry Island channel a short distance above the place where the dredge was lying, and had the Maling obeyed it the collision would not have occurred; for in coming down the channel she would have been so far to the west that after reaching the point where the channel widens to the east she could not have collided with the dredge without an unnecessary and aimless change of course. It would have been "safe and practicable" for the Maling to keep to the westerly side of the channel and there were no "special circumstances" rendering a departure from the rule "necessary in order to avoid immediate danger" in the words of article 27 of the above act. The Maling was, therefore, at fault in being on the easterly side of the channel at the time of the waving of the lantern and the blowing of the signal blast by the tug. But this was not her only fault. The evidence shows that when she was thus signaled she was, with her speed through the water and with the ebb tide, moving over the ground at the rate of not less than ten miles an hour. As soon as the lantern was exhibited the master of the Maling asked the pilot, "What signal is that?", and on the pilot's replying that he did not know, said to him "It looks as though he wants us to pass the other side." Matters were not at that time in extremis. The Maling was heading clear of the dredge and at a distance, as before stated, of about a third of a mile. A seriously contested question, on which much evidence has been adduced, is whether the side-lights of the tug were not in position and visible to those on the Maling when the lantern was first waved. The view I have taken of the case has rendered it unnecessary to decide this question. If, however, those lights were visible to the pilot and he was led to believe that the dredge and tug were then moving eastward his duty was obvious. In that event, without waiting for any signal from the tug he should immediately have ported the helm in order to pass to the westward. But if the tug's side-lights were not at that time visible and he then, as he had theretofore, recognized the dredge as a stationary vessel, he should without waiting until the blast came from the tug, unless sure of his ability to clear the dredge by porting, instantly have ordered the stopping and reversal of the engines. Had this course been pursued without any subsequent·porting of the helm the collision would have been avoided even if the headway of the Maling had caused her to part the port lines of the dredge and set her adrift,—a matter of comparatively small moment in view of the fact that the tug with steam up was then lying fast to her. Or had the helm been ported only after such stoppage and reversal of the engines it would have been problematical at least whether the collision would have occurred, or whether the damage would have been serious if it had occurred.

It is unnecessary to discuss other alleged faults on the part of the Maling. For the reasons above given the Maling, the dredge and the tug were all in fault and each contributed to the collision which would not, in my opinion, have occurred had it not been for the fault of all of them.

The only remaining question relates to the division of damages and costs. On this point I have had some doubt whether there should not be an equal division between the dredge and the Maling. As between the tug and the dredge it would be grossly inequitable that the tug should be made to suffer for doing only what she was induced by the dredge to do through the waving of the lantern in conjunction with the exposed condition of her port lines. The faults of the dredge and tug respectively were not wholly separate and independent of each other. There was a causal connection between the waving of the lantern and the blast from the tug. There was co-operation between the dredge and the tug in inducing the Maling to port her helm. On full consideration, however, I am satisfied that on both principle and authority the right of recovery on the part of the libelants as against the Maling is limited to one-third of the total damages and costs. All three vessels were in fault. Originally the Maling was the only defendant. The tug was brought in as a co-defendant by petition on the part of the Maling pursuant to rule 59 in admiralty. The rule provides that when a vessel is brought in the "suit shall proceed as if such vessel * * * had been originally proceeded against," and that such a decree shall be "rendered by the court in the suit as to law and justice shall appertain." It can, therefore, be assumed, for the purpose of ascertaining the proportionate liability of the several vessels, that the tug and Maling were originally libeled as co-defendants. Unlike the rule at common law, contributory negligence in a collision case in admiralty does not defeat a recovery. In such a suit between two vessels only, if both were in fault, the entire damages resulting from the collision must be equally divided between the parties. As stated by Mr. Justice Bradley in delivering the opinion of the court in The Alabama and The Game-cock, 92 U. S. 695, 697, 23 L. Ed. 763, 764, "the safety of navigation requires that if they are both in fault, they should bear the damage equally, to make them more careful." This rule of equality is enforced without regard to any disparity in value or in degree of fault as between the two vessels. In The Atlas, 93 U. S. 302, 313, 23 L. Ed. 863, 865, the court said:

"Under the second of the foregoing rules,—when both vessels are in fault, —the sums representing the damages are added together, and the amount is equally divided between the parties: and that rule prevails in all cases where there is mutual fault, even though one of the vessels may have been much more in fault than the other. Fault being imputed to both vessels, and the charge being proved, the inquiry which was most to blame is immaterial, as the damages must be divided between the two, according to, the rule provided in the admiralty courts."

If a vessel free from fault be injured through the concurring and co-operating faults of two other vessels all the damages resulting from the collision may be recovered from either or both of the latter. If only one of them be proceeded against and the other be not brought in as a co-defendant, there may be a recovery in solido

from the vessel libeled. But if both of the offending vessels be proceeded against, the decree must primarily apportion the total damages and costs equally between them, reserving to the libelant the right, in case of the insufficiency of either of the two vessels to pay her moiety, to collect the deficiency from the other. The Washington and The Gregory, 9 Wall. 513, 516, 19 L. Ed. 787; The Alabama and The Game-cock, 92 U. S. 695, 697, 23 L. Ed. 763; The Juniata, 93 U. S. 337, 340, 23 L. Ed. 930; The City of Hartford and The Unit, 97 U. S. 323, 329, 24 L. Ed. 930; The Civilta and The Restless, 103 U. S. 699, 26 L. Ed. 599; The Sterling and The Equator, 106 U. S. 647, 1 Sup. Ct. 89, 27 L. Ed. 98. In the last case Mr Chief Justice Waite, delivering the opinion of the court, said:

"The well-established rule in such cases is to apportion the damages equally between the two offending vessels, the right being reserved to the libelant to collect the entire amount from either of them to the extent of her st——ulated value, in case of the inability of the other to respond for her portion."

The same considerations of policy and convenience which require an equal division of damages and costs between two vessels in fault, where the owner or master of one of them proceeds against the other, require a similar division between two vessels in fault, where the owner or master of a vessel not at fault proceeds against them for damages on account of collision, subject to the paramount right of the innocent party to receive full compensation by resorting, so far as one of the offending vessels is insufficient to pay her moiety, to the other in order to make up the deficiency. It is true that the innocent party should not be made to suffer by the application of the rule of equality as between wrongdoers. In The Alabama and The Game-cock, supra, the court, speaking of the innocent party, said:

"He ought not to suffer loss by the desire of the court to do justice between the wrong-doers. In short, the moiety rule has been adopted for a better distribution of justice between mutual wrong-doers; and it ought not to be extended so far as to inflict positive loss on innocent parties."

But, subject to the right of an innocent party, when necessary for obtaining full compensation, to recover from one of two offending vessels more than her portion of the damages and costs, the rule of equality is strictly enforced as between the wrong-doers without regard to inequality of fault or of value between them. Such being the settled law in case of collision where the libel is filed on the part of a vessel without fault against two vessels in fault, it seems to follow as a necessary consequence that, if all three vessels have been guilty of fault contributing to the collision, the total damages and costs must be equally divided between them. Precisely the same considerations of policy and convenience which require equality of division as between two offending vessels where one is libeled on the part of the other, or between two offending vessels where both are libeled on the part of a vessel not in fault, demand equality of division as between three vessels all of which are in fault, where two of them are libeled on the part of the third. Certainly the filing of the libel by one of them against the other two cannot entitle the first to an advantage or an immunity with respect to damages and costs not possessed by each of the others,

when all of them have been in fault. The circumstances of the collision remaining the same, the quantum of liability of any one of the three vessels cannot be enlarged or diminished by the position she occupies on the record as a co-defendant, on the one hand, or as plaintiff, on the other. Were it otherwise, the mere arrangement of the parties on the record would have the effect of substantially altering their liability. Where in a case of collision three vessels have by their fault contributed to the disaster and they are all before the court, no other rule than that of equality of division of damages and costs can, in my judgment, consistently with the doctrine to be extracted from the cases decided by the supreme court or with principle be applied. If this rule is not applicable, the determination of the proportionate liability of the several vessels must necessarily be left to the discretion of the court. Such I do not believe to be the law. The rule of equality commends itself both on principle and on authority. The Brothers, 2 Biss. 104, Fed. Cas. No. 1,969; The Peshtigo (D. C.) 25 Fed. 488. Had the tug not been brought in as a co-defendant the damages and costs must, under the settled doctrine of the supreme court, have been equally divided between the dredge and the Maling. The latter vessel, in order to relieve herself of a portion of the burden in the event of her being adjudged in fault, brought in, under the rule prescribed by the supreme court, the tug as a co-defendant, alleging fault on her part contributing to the collision. That the tug was in fault I have no reason to doubt. It is true that the tug was induced to give her deceptive signal to the Maling by the dredge; but the tug in doing so did not act on compulsion. She was a free agent. She was not the mere servant of the dredge, bound to obey its orders. In fact no order appears to have been given by the dredge to the tug to blow her whistle; but had it been otherwise she was not bound to yield obedience. The tug is not embraced in the category of vessels so related or connected with others as to be mere inert, passive, helpless instruments, without accountability for their movements or signals. All the vessels having been in fault, the Maling cannot be visited with more than one-third of the damages and costs. Another third must in any event be borne by the dredge. The remaining third would properly be recoverable from the tug, had not the latter been induced by the dredge to do the precise thing which constitutes her fault. As before stated, it would be grossly inequitable that the tug should at the instance of the dredge be made to suffer in consequence of the action of the latter vessel. Here the libelants are seeking to obtain compensation for the injuries sustained by the dredge. They are precluded, not by estoppel in a strict sense, but by the substantial justice and equities of the case, from any recovery against the tug. But the fact of the inability of the libelants to recover a third of the damages and costs from the tug cannot enlarge or in any manner change the primary liability of the Maling for only one-third of the damages and costs. For the reasons given all the damages and costs must be divided between the Maling and the dredge; the Maling to bear one-third and the dredge the remaining two-thirds.

Let a decree be prepared in accordance with this opinion.