## THE LAKE SHORE.

### (District Court, W. D. New York. January 3, 1907.)

**1. COLLISION—STEAM VESSELS PASSING—DELAY IN ACTING ON AGREEMENT.**

The large freight steamer Lake Shore was swinging out from her dock in Buffalo river to start on her trip up the Lakes as a steam barge was entering the river 1,000 feet distant. The barge, seeing that the steamer was moving, gave her a signal of one whistle to pass port and port, which, not being answered, was repeated. The Lake Shore about that time sounded two whistles, but the barge, which was going to starboard immediately, blew an alarm, and repeated her one blast, which was then acceded to by the steamer. At this time the barge was 100 feet distant, with her helm hard aport and her engine stopped. The steamer, however, continued her swing to port, and struck the barge on her port bow. *Held,* on the evidence, that the Lake Shore was solely in fault for failing to maintain an efficient lookout or to promptly stop her swing after assenting to the signal of the barge, as she might have done, and that the barge was not in fault, having stopped her engine and being as close to the south pier as she could safely go.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Collision, § 203.]

**2. SAME—VESSEL UNDER WAY.**

Where a steamer had left her berth, her propeller was moving and she exchanged passing signals with another vessel, she cannot escape liability for alleged negligent navigation on the ground that she was not under way.

In Admiralty. Suit for collision.

Brown, Ely & Richards and Hoyt, Dustin & Kelley, for libelant.
Clinton & Clinton and George Clinton, for respondent.

HAZEL, District Judge. On the 15th day of September, 1903, the freight propeller Lake Shore and the steam barge Cormorant, while passing in Buffalo river at the entrance to the channel, came in contact; the former striking the Cormorant on her port bow, breaking the hawser pipe, parting the stem, and opening her decks. This action is brought to recover the damages sustained; the libel charging that the Lake Shore alone was in fault for the accident.

The material facts are these: On the morning of the collision, the weather being clear, the Lake Shore, heading out in the river, was moored on her starboard side to the Lackawanna Coal Dock; her bow being about 200 feet from the end thereof. She was ready to swing out into the river, which at that point was 215 feet wide, preparatory to starting on her trip up the Lakes. She was 376 feet over all, 50 feet beam, drawing 18 feet 7 inches of water, and was loaded with 6,800 tons of coal. The Cormorant was 218 feet long, 34 feet 6 inches beam, drawing 9 feet forward and 14 feet aft, and was partially loaded with lumber. In order to get into the channel at the mouth of the Buffalo river from the Erie Basin, it was necessary for the Cormorant in tow of a tug to go around the old basin breakwater. When she reached a point at the end of the breakwater, which was about 2,200 feet from where the Lake Shore was lying, the tug let go the lines and the Cormorant straightened in the channel and proceeded toward the river at the rate of about four miles an hour. Her master at once observed the Lake Shore, which was then still close to the

wharf. Soon afterwards he saw that she was getting underway; her bow having moved out into the stream about 10 feet. At this time the bow of the Cormorant was abreast of the south pier and distant from the bow of the Lake Shore something more than 1,000 feet. Her master, regarding the latter as a navigating vessel, blew one blast of the whistle to indicate his intention to pass on her port side, and immediately checked his speed. The Lake Shore, however, did not reply to the signal. It was explained at the trial by Capt. Hahn, master of the respondent vessel, that at this particular time he did not regard his vessel as underway, and supposed the one blast signal to have been blown to an outward-bound tug, which, according to respondent's witnesses, answered the signal. Several witnesses for the respondent testified to the presence of the tug and the blowing of the signals mentioned, and a like number of witnesses for libelant, including the master of the Cormorant, testified that they did not perceive a tug passing out of the river, and that the signal was blown to the Lake Shore, which was slowly leaving her berth. Assuming the presence of the tug, I am, nevertheless, of the opinion that it is proven that the signals were blown to the Lake Shore; she being concededly the nearest craft. The Cormorant, receiving no reply to her initial signal, sounded another one blast of her whistle, at the same time reducing her speed to about two miles per hour and putting her helm aport. In the meanwhile the Lake Shore, which was slowly swinging toward midchannel, sounded two blasts of her whistle, indicating her desire that the Cormorant should pass to starboard. The latter vessel, objecting, immediately blew an alarm and quickly sounded another single blast, which the Lake Shore answered with one blast, thereby receding from her previous request that the Cormorant pass to starboard and assenting to her passing on her port side. At this critical moment the Cormorant, with her helm properly hardaport and her engine stopped, was approximately 100 feet distant from the bow of the Lake Shore, and probably from 10 to 20 feet from the south pier, making headway at the rate of about one mile an hour. The Lake Shore continued to swing slowly to port, impinging the Cormorant. A careful examination and consideration of the evidence and argument of proctors has made it clear that the Lake Shore failed to seasonably stop her swing to port or alter her course after assenting to the signal of the injured vessel. I think the Cormorant had a right to presume, not only that the Lake Shore would stop swinging out beyond the middle of the river toward the south pier, but that she would seasonably provide sufficient space for passing port to port. The Frederick M. Wilson, Fed. Cas. No. 5,078.

Respondent contends that she was going astern at the time of the impact; that there was sufficient room for safe passing, about 45 feet; and, if the Cormorant had been properly navigated or controlled, the accident would not have happened. The testimony as to whether the Cormorant sheered toward the Lake Shore is in conflict; the witnesses for both sides being indefinite as to distances, and also regarding the precise manner in which the vessels impinged. Although the testimony for the libelant as to the exact position of the Lake

Shore at the time of the contact perhaps is not free from criticism, I am, nevertheless, reasonably satisfied that the primary responsibility for the collision is attributable to the Lake Shore, and that she alone must bear the consequences of her negligence. The Cormorant, with her helm hardaport and close to the south pier, was as skillfully navigated as the situation created by the negligence of the Lake Shore permitted. It is not improbable that the narrowness of the channel, together with the movements of the vessels, would cause a displacement of the water, resulting in the Cormorant sheering from the south pier and toward the bow of the Lake Shore; but I think a fair preponderance of the evidence indicates that the latter vessel did not seasonably stop swinging to port. True, the Lake Shore reversed her engine, and ordinarily the tendency would be to throw her stern to port and her bow to starboard, but this movement, in my judgment, was not executed with sufficient promptitude to avoid the accident. That Capt. Hahn suspected that he was greedy of the channel and probably could not promptly check the swing of his vessel may be inferred from his signaling the barge to turn out of her course on the south side of the river and pass starboard to starboard.

Charges of fault are also made against the steamer Lake Shore, in that she did not maintain an attentive lookout. Capt. Hahn, who was on the pilot house, swore that he did not see the approaching barge until he had directed his steamer to go ahead slow; the Cormorant then being at about the end of the south pier. He heard her signals, but assumed they were blown to a passing tug. When the bow of his steamer had swung 25 feet out in the river, he claims to have blown an initial signal of two blasts; the barge answering by an alarm quickly followed by a single blast. He answered, assenting to the barge passing port to port. He also testified that he reversed his steamer when she was approximately 50 feet from her berth, and later in his examination he swore that the accident happened in midstream. Thus it would seem to be shown that the Lake Shore continued to swing to port after the assenting signal was sounded. In my judgment the Cormorant cannot be held in fault for failing to assent to the starboard passing; for, in the exercise of proper precaution, the situation did not at the time of said signal warrant such a maneuver on her part. If an attentive lookout had been stationed forward at the instant the Lake Shore left her berth, the approaching steam barge doubtless would have been observed immediately as she turned in the channel, and, moreover, the different signals, indisputably sounded by her, would unquestionably have been understood. The presence on deck of the master of the Lake Shore did not render the service of a careful lookout indispensable, nor was she excused, even though just leaving her berth, from adopting such reasonable precaution to prevent collision as the situation required, specially as it may be presumed that at this time her master was variously occupied with the management of the vessel. Hence the failure of the Lake Shore to heed the signals of the Cormorant was a fault for which she must be held liable.

A further charge made against the Lake Shore is that rule 17 of

the statutory rules and rule 1 of the inspectors' rules were ignored, and therefore a dangerous situation was presented. The first-mentioned rule provides for signaling for vessels underway to pass each other on the port side, and the second rule relates to steamers approaching head and head. Respondent contends that these rules were inapplicable to the situation, as the Lake Shore was not strictly a vessel underway. This point is not maintainable, as it has been held that when signal lights for vessels under way are displayed by a vessel aground and such vessel answers signals, leading a navigating vessel to believe that she will keep out of the other's way, she will be held in fault and responsible for damages resulting from her action. The F. W. Wheeler, 78 Fed. 824, 24 C. C. A. 353; The Maling (D. C.) 110 Fed. 227; The Morris B. Grover, 92 Fed. 678, 34 C. C. A. 616. The Lake Shore had left her berth, her propeller was moving, her master was on the pilot house, signals were sounded by her to direct the movements of other vessels, and accordingly she cannot be heard to say in excuse of asserted negligence that she was not navigating. However, I am unable to see how fault in this respect can be imputed to the Lake Shore inasmuch as her invitation to pass to starboard was not accepted by the Cormorant. Undoubtedly the situation on account thereof became somewhat confused, but I do not think that the signals of the Lake Shore, even if they had been in violation of the statute, were a contributing cause of the mishap.

My conclusion is that the respondent was in fault, first, for not keeping a proper and sufficient lookout; second, that her master was not sufficiently attentive to the initial signals of the Cormorant; third, that he continued to swing to port after the signal assenting to the passing port to port was sounded; and, finally, that he managed his vessel in such a negligent manner as to cause her to impinge the Cormorant. The various allegations of fault on the part of the Cormorant as alleged in the answer are not sustained.

A decree will be entered accordingly in favor of the libelant against the Lake Shore, with costs, and an order of reference may be taken to the clerk to state the amount.